FOURTH DIVISION

June 6, 2002

No. 1-01-4442

DELTA MEDICAL SYSTEMS, )    Appeal from

) the Circuit Court

Plaintiff-Appellee and Cross-Appellant
, ) of Cook County.  

) 

v. )  No. 01 CH 12496

)

MID-AMERICA MEDICAL SYSTEMS, INC., )

MICHAEL DONATI, and JOHN OTTUM )      Honorable
  

)   Bernetta Bush,

Defendants-Appellants. )  Judge Presiding.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff Delta Medical Systems (Delta), filed a multicount complaint in the circuit court of Cook County seeking injunctive relief to prevent defendants, Mid-America Medical Systems, Inc., Michael Donati, and John Ottum (collectively Mid-America), from using Delta's alleged trade secret information
 and from soliciting and servicing its customers.  Following an evidentiary hearing, the circuit court issued a preliminary injunction restraining Mid-America from soliciting and servicing certain Delta customers, and ordered Mid-America to remove its service tags from certain Delta customer equipment.  Mid-America now appeals from this interlocutory ruling pursuant to Supreme Court Rule 307(a)(1).  188 Ill. 2d R. 307(a)(1).  They contend that (1) plaintiff was not entitled to a preliminary injunction; (2) Delta's customer list and data are not trade secrets that were misappropriated; (3) the trial court improperly denied consideration of Mid-America's motion to dissolve the temporary restraining order, issued a written order that does not comport with its oral ruling, and refused consideration of its motion to modify the order; and (4) the trial court made various errors regarding the admission of evidence.  Delta cross-appeals contending that it was entitled to broader relief than the court afforded.  For the following reasons, we reverse and remand for further proceedings.

BACKGROUND 

Delta is a Wisconsin corporation founded in 1979 that sells and services various types of medical diagnostic equipment utilized by hospitals and clinics.  The company conducts business in Wisconsin, Minnesota, and Illinois, has approximately 40 employees, and generates revenues of about $18 million per year.  In 1995, it opened a Schaumburg, Illinois, office with eight field employees, including defendant Michael Donati as the service manager and defendant John Ottum as one of the service engineers.  As part of their job duties, Donati and Ottum were responsible for soliciting new sales and servicing equipment.  

Prior to joining Delta, Ottum had worked for Advanced Diagnostic Systems, Inc. (ADS), a company owned by his father, Robert Ottum.  During 1995, Delta acquired ADS.  The acquisition gave Delta a customer base upon which it could expand its equipment sales in Illinois, including some mammography equipment sales.  The asset purchase agreement identified ADS' assets as including its "customer lists and information including sales history, service records, and related information."  After selling his ADS business, Robert Ottum worked for Delta from 1995 to 1998.

At the time of the ADS acquisition, Delta was a dealer of mammography equipment manufactured by Hologic Systems Division, formerly known as the Lorad Division of Trex Medical Group (Lorad), in the Wisconsin, Minnesota, and northern Illinois area.  However, in February 2001, Delta terminated its dealership agreement with Lorad and announced that it would become a dealer for Siemens Medical Systems, Inc., a medical equipment competitor in the same markets.  When Delta terminated its dealership agreement with Lorad it was aware that it would experience some erosion of the Lorad service business and expected that another dealership would enter its territory to compete.

Sometime in February or March of 2001, Robert Ottum began discussing the formation of a new company with defendants Donati and Ottum, and began discussions with Lorad about the possibility of securing a Lorad dealership.  On May 9, 2001, Mid-America was incorporated; its shareholders included Robert Ottum, Allan Pozdol, and defendants Donati and Ottum.  At that time, 
Lorad informed Mid-America that it would be granting it a dealership.  The next day Robert Ottum announced the formation of his new company to his long-time friend Paul Andresen, the diagnostic imaging director at Kishwaukee Community Hospital, and told him that defendants Ottum and Donati would be joining the company.  Robert Ottum also informed him that Mid-America had become the exclusive Lorad dealer in northern Illinois.     

Thereafter, on June 1, 2001, Lorad executed a dealership agreement with Mid-America for the sale and service of mammography equipment in northern Illinois.  Defendants Donati and Ottum gave notice to Delta of their intent to leave the company and resigned from their employment with Delta on June 15, 2001.  
Soon after Mid-America began business operations, several Delta customers with Lorad equipment terminated their relationship with Delta in favor of doing business with Mid-America.    

On August 1, 2001, Delta filed a complaint for injunctive relief against its former employees, Donati and Ottum, along with the newly formed company, essentially alleging that they misused trade secret information in order to set up and operate a competing business and raid Delta's customer base.  It further alleged that they misappropriated its confidential customer data encompassing the following: "the identities of customers, the needs and preferences of customer contact persons and decision-makers, the model numbers, identification numbers, and service histories of equipment located at each customer site, the terms of contracts for ongoing maintenance services, time and materials pricing to customers without service contracts or for services that went beyond those contracted for, information concerning customers' evolving needs, * * * contract expiration dates, and costs and profit margins for parts and services." 

Delta's complaint included causes of action for breach of the common law duty of loyalty and misappropriation of corporate opportunities, a violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 
et
 
seq.
 (West 2000)), tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition.  On August 3, 2001, the circuit court entered a temporary restraining order prohibiting Mid-America from continuing to solicit Delta's customers and from using or disclosing its customer data.  Thereafter, an evidentiary hearing was held on Delta's petition for a preliminary injunction.  The evidence adduced at that hearing is summarized below.

Delta's Customer Data

Both parties agreed that their industry is highly competitive.  Delta introduced several witnesses to testify regarding information that the company believed to be trade secrets.  Anthony Krause testified that he was the Wisconsin area service manager for Delta from 1993 to 1999, and thereafter was a technical specialist based in Illinois.  He explained that in 1993, before the opening of the Schaumburg office, Delta used a generic service contract that provided only a minimum level of service.  Over time, through input from him and other employees, several changes were made in an effort to separate its service contract from the competitor.  The contract incorporated multiple service level options, a regulatory compliance program, exceptions from coverage for certain parts and services, margins for time waited and overtime, and an automatic-renewal feature with a predetermined price increase.  The contract had been uniquely customized to serve client needs and preferences.

Krause further testified about contract pricing and the service history of customer equipment.   He, along with Paul Wunsch, the president of Delta, and James Ziebart, executive vice president and general manager of Delta,  testified that pricing is a function of knowing the service history of a customer's equipment.  Krause explained that the service history refers to the age, usage, problems, and maintenance relating to a particular piece of medical equipment.
  Krause noted that Delta considers the following factors in pricing a service contract: the type of equipment, the usage of the equipment, the age of the equipment, the service history, and customer preferences.  The data enables the service provider to gauge the probable time and material that will be necessary to meet its obligations under a long-term service contract and make a profit.  Donati testified that he did not know what the competitors charged for their services and did not know the specific terms of their contracts.  He also stated that while
 it would be helpful to have the service history information on a particular piece of equipment, it was not necessary in soliciting new business.

Krause also testified that prospecting for customer contacts is time-consuming, and gaining an audience with the decision-maker can take months of exposure because the service provider may discover that a manager at a different level is actually the person with the authority to select the service provider and approve the purchases of new equipment.  Donati denied that it was difficult for him to obtain contact information when soliciting new business.
  Ronn LaBrasca, Delta's former vice president for sales and service, testified that experience in the industry is helpful in identifying customer contacts.  

Jacqueline Szymanski, the practice administrator for Randallwood Radiology and a former customer of Delta, stated that this information could be ascertained at her facility by simply making a phone call.  She explained that as the customer, she works closely with the technicians and develops a relationship with the service engineer.  Additionally, she testified that if a dealer did not know the service history and she wanted it to service her equipment, she would share that history with it.  Krause also acknowledged that sometimes the basis upon which a customer relies in deciding who is going to service its equipment is the relationship it has developed with the service engineer. 

Mid-America introduced evidence to support its position that Delta’s customer information is readily obtainable through public means.  When new diagnostic equipment is installed, the installer is required to record certain information with the Illinois Department of Health and Human Services and the Illinois Department of Nuclear Safety.  Form 2579 provides the name, address, and phone number of the customer where the equipment was installed; the name, address, and phone number of the company that installed the equipment; the type, serial number, and date of manufacture of the equipment installed; the name of the individual that installed the equipment; and the date of installation.  Donati testified that Mid-America obtained this information through a Freedom of Information Act (FOIA) request.  5 ILCS 140/1 (West 2000).  

In addition, the Lorad manufacturer provides its dealers like Mid-America with similar information.  Mid-America introduced a list produced by Lorad of all its customer base in Illinois with Lorad equipment.  The Lorad list includes the company that installed the equipment; the customer name; the customer's medical specialty; the model number of the equipment; and the date on which the equipment was shipped.  Ziebart testified that these reports do not provide information on the service history of the equipment, do not identify who is currently servicing the equipment, who the decision-maker is who chooses the service provider, or how much the service provider is charging for its services.

Robert Ottum testified that one can subscribe to various Internet subscription services that compare equipment types and prices.  He stated that for a fee, these services provide information regarding equipment specifications and the range of prices charged for equipment.  According to Ottum, they will also review service contracts.  However, Paul Wunsch stated that these services only publish the prices charged for new equipment, not the price of equipment services.

Confidentiality of Customer Data

During their period of employment, neither Donati nor Ottum signed a confidentiality agreement or a restrictive covenant limiting his right to compete with Delta upon leaving the company.  Delta issued an employee handbook in 2000.  It generally admonishes employees that customer data is not to be shared with outsiders
 or other employees except on a "need-to-know" basis.   Both Donati and Ottum acknowledged reading this provision and understood that it applied to "customer data."  However, customer data was not specifically defined in the handbook or explained to them by Delta.  Donati was not asked if he understood what that term "customer data" meant.
  
Ottum agreed that service history, pricing, and identities of contact persons were customer data.  While he understood that service history and prices could be found in the company database housed in Milwaukee, he stated that he never received any documents with that information on it in his role as a service engineer. 

  

Donati stated that there were no procedures for maintaining the confidentiality of customer data.  All of the employees required access to some customer data in order to perform their job duties.  Everyone had access to his desktop computer for e-mailing purposes, and the password was the same for everyone.  He explained that the customer service contracts were maintained in the Milwaukee office, but that copies were also frequently sent to the Schaumburg office by e-mail, fax, and regular mail.  They were not kept in a specific place.  Rather, Donati stated that he tried to give them to the employee that would be presenting the contract.  Sometimes he kept a copy for
 himself on his desk.  He further testified that the only information maintained in the file cabinets
 was blank forms, such as time sheets and expense reports.  The office had no policy regarding the locking of doors, but it was understood that the last person out was responsible for locking the door.

Judith Zugel, the Delta customer service manager, corroborated Ottum's testimony that information pertaining to customer contracts was not regularly provided to the service engineers.  The access to Delta's computer databases in Milwaukee was restricted through the use of passwords, and each password was unique.  Information including billing, customer service history, and customer equipment could be found on the computer database.  Additionally, she stated that there was a place to include customer contact information in the database, but that "there's none of that in there."  She was responsible for overseeing and maintaining the database and explained that only six users were trained to utilize the database and that "most of the people don't know how to run any of the reports."  After Donati and Ottum resigned, she sent Donati a report of the signed Delta service contracts that Donati and Ottum had procured during their last four months of employment at Delta to inform them of their earned commissions.  The report included the name of the customer, the manufacturer and model number of the equipment, the date the service contract was sent and signed, and the price of the contract.  The report was not marked "confidential.”

Krause testified that at the time Delta was absorbing ADS's business, there were no written protocols or manuals with respect to security measures.  The information was being shifted into the Milwaukee office in order to obtain centralized control of the information.  Everything was "kind of verbal."  While Krause worked in the Shaumburg office, Donati controlled what went on ,and Krause never received any written guidelines from Donati regarding the handling of
 customer data.  Krause further testified that service history and pricing information was available from the Milwaukee home office on a "need-to-know" basis because it was confidential information.  Customer service contracts were not routinely kept in the Schaumburg office.  Krause stated that equipment lists, active service tickets, and some active contracts were kept in Donati's desk drawers in Schaumburg.  All service engineers and salespersons had access to confidential information at one time or another to do their jobs.  There was nobody on staff to man the Schaumburg office. 

Paul Wunsch testified that employees are taught about confidentiality of customer data by example by working with other service engineers and other salespeople.  He referred to the employee handbook, which states the general guidelines, but he did not see the need to stamp documents and create extraordinary security measures.  He acknowledged that there were no written protocols or directives with respect to the treatment of confidential data at Delta other than the employee handbook.  He testified that Delta's main office door is locked, and any time an employee leaves the company, the  locks on the office door are changed.  Donati gave conflicting evidence, explaining that  no locks were changed when a former employee had resigned.  According to Wunsch, Delta did not have a policy to lock customer files.  Employees have access to information regarding customer location, equipment, contracts, contact names, and service history in files and on the computer.  It was also his belief that Zugel was aware of who should have access to what information and that she did not need written protocols.
  
    
 

Ronn LaBrasca testified that he worked for Delta from 1994 through 2001 and
 was Delta's former vice president for sales and service.
  He stated that while it was not expressly communicated to him that he was not to reveal pricing and other customer information, it was understood that it was not to be done based upon professional business practices.   He recalled that service contract forms were available in file cabinets.  He generally obtained service histories if needed from Zugel.  It was his understanding that employees were required to return their computers when they left the company.  When he hired employees he never discussed confidentiality with them, and when he was hired he was never told about confidentiality and the importance of confidentiality at the
 company.  He was never denied access to any information that he requested.  There were no signs on the file cabinets marked "confidential."  He was never told to change his password, but he probably could have changed it.  While he did not take customer files with him, he did retain general knowledge of pricing, customer contacts, service histories, and contracts.  

Several witnesses also testified regarding customer behavior as to whether customers readily share contract terms and pricing information with vendors like Delta and its competitors.  Donati testified that in soliciting new service business, he was not aware of a Delta customer making the data in its service contract available to a competitor.  Krause testified that customers typically treat contract terms and pricing as confidential and do not share this information with other competing vendors.  Robert Ottum testified that he believed customers would share contract pricing information if asked.  He was impeached with his deposition testimony that customers would not tell him, but he could use other means to find out.  Wunsch stated that Delta had no written guidelines for the handling of its service contracts with its customers, and he acknowledged that he could not control what a customer would do with a contract provided by his company.  He believed that if a customer's employee disclosed its vendor's pricing information to a competing vendor, the employee could lose his or her job.  

LaBrasca stated that while customers would not provide pricing information and contract terms as a matter of course, if a customer wanted to do business with Delta, it would provide Delta with the information.  Robert Ottum further testified that his long-time friend Andresen provided him with a copy of the Kishwaukee hospital service contract and sent the contract to an Internet subscription service for review.  Szymanski testified that she did not consider the information in Delta's service contracts to be confidential, but she never personally disclosed the information in the contract to third parties.   Ziebart testified that if a customer requested service history information from Delta, it would provide that information.

Alleged Misappropriation and Use of Delta's Trade Secrets

Ziebert testified regarding Donati and Ottum’s departure from the company.  He stated that Donati came to see him in May of 2001 and told him that he intended to leave Delta.  When Ziebert asked if he had anything “lined up,” Donati responded “no” and stated that he was interested in “moving on to other things.”  During that time, Randallwood Radiology had a contract with Delta which stated that it would automatically renew upon the termination of the 12-month period ending May 30, 2001, unless written notice was provided within 30 days.  In April and June, Delta prepared a new service contract proposal for Randallwood Radiology to sign.  Donati acknowledged that he gave such a contract proposal to Ottum to have signed by Randallwood.  Ottum could not recall whether he was given such a contract.  He testified that if he had received such a contract he could have had it signed.  One month later, after the formation of Mid-America, Donati and Ottum presented Randallwood with an identical contract, which Randallwood signed.  However, Szymanski testified that she chose to enter into service agreements with the company that is the dealer of the equipment based upon her relationship with the service engineer.  She had a business relationship with Robert Ottum for 15 years and had worked with Sam Ottum for several years.  She testified that she chose to do business with Mid-America and terminate her relationship with Delta because of that long-term relationship with the Ottums.  She also stated that she was concerned that Delta could not get parts for its Lorad equipment as quickly as Mid-America could as the dealer.  

Ziebart further testified that on June 12 or 13, 2001, he was informed that Ottum and Donati were leaving to start a new Lorad dealership.  Ziebart stated that he immediately contacted Donati and admonished him that the Delta customer data was confidential and could not be used to start his new company.  According to Ziebart, Donati assured him that he would not use any of the information against Delta.  Ziebart additionally testified that he found stacks of customer data dating back to 1999 on Donati’s desk.  He had never seen a compilation of data like this on a service manager’s desk before.  Krause testified that there was no day-to-day use for that type of data and would only be useful in developing an overall picture of Delta’s activity in a particular market.  

Donati admitted that when he left Delta’s office on June 15, 2001, he took with him a copy of a Delta contract and service form and used them to create identical contracts and service forms for use by Mid-America.  Ottum stated that when he started out in the business, he maintained an address book with customer names, phone numbers, and some contact information.  He continued to update it throughout his employment.  He had recently acquired a Palm Pilot and transferred the data into the Palm Pilot.  He used that information to call on customers after he left Delta.  Donati and Ottum acknowledged that they targeted the Delta Lorad customers with whom they had a relationship.    

Zugel testified that at an office farewell party, Ottum’s spouse told her that she was working for Mid-America and that the company had targeted Delta’s Lorad customer base.  It was also disclosed at the hearing that defendants sent a letter to some Lorad customers that Delta could no longer service Lorad equipment or provide parts and upgrades in a timely fashion, and that Mid-America was the exclusive Lorad dealer in the area.  Robert Ottum acknowledged that Mid-America was not in fact the exclusive dealer.  According to Ziebart, while Delta would no longer be able to obtain parts at dealer prices from Lorad, Delta had a large inventory of parts and could obtain them through other sources, and Mid-America was aware of this ability. 

Trial Court Findings and Conclusions

Initially, the court found that there were no noncompete clauses in any of the contracts and that Mid-America had an absolute right to enter into a competitive business within the geographic location at issue.  The court found that "[t]he Delta customer list and customer data, individual customer contacts, the customer references of Delta, the service list for customer equipment, contract terms, and contract expiration dates, are secret enough based upon the testimony of the parties in this case to derive economic value from it." 

 The court further held, relying on 
Elmer Miller, Inc. v. Landis
, 253 Ill. App. 3d 129, 625 N.E.2d 338 (1993), that Delta was a small company that did not have to meet the strict standards of confidentiality imposed on larger companies, and that given the nature of the business, Delta took reasonable measures under the circumstances to maintain the information as secret.  The court additionally found that the trade secrets were misappropriated, finding that defendants targeted Delta customers by utilizing Delta information, Delta contracts, and contact people learned through Delta to elicit business, they had discussions regarding the volume of business they could generate by targeting specific Delta customers, and they used Delta contracts as a template for the acquisition of business.  While there were numerous dealers with customers that used Lorad equipment, defendants targeted the Delta customers.  However, the court excluded the Kishwaukee and Randallwood contracts, finding that defendants had an independent basis upon which to ascertain those customers.

ANALYSIS

We begin our analysis by addressing Mid-America's contention that the trial court improperly found that Delta met the requirements for granting a preliminary injunction.  A preliminary injunction is an extraordinary remedy which is applicable only to situations where an extreme emergency exists and serious harm would result in the absence of an injunction.  
Buzz Barton & Associates, Inc. v. Giannone
, 108 Ill. 2d 373, 386-87, 483 N.E.2d 1271, 1277 (1985).  However, the purpose is to preserve the status quo pending a decision on the merits; therefore, a plaintiff does not carry the same burden of proof that is required to prevail on the ultimate issue.  
Buzz Barton & Associates, Inc.
, 108 Ill. 2d at 386, 483 N.E.2d at 1277.  The party seeking the injunction must establish the following: (1) it has a clearly ascertained right which must be protected; (2) it will be irreparably injured in the absence of that protection; (3) there is no adequate remedy at law; and (4) there is a likelihood of success on the merits.  In addition, the trial court must then conclude that the balance of hardships to the parties supports the injunctive relief requested.  
Gillis Associated Industries, Inc. v. Cari-All, Inc.
, 206 Ill. App. 3d 184, 188, 564 N.E.2d 881, 883 (1990).

Generally, the standard of review for a preliminary injunction is whether the trial court abused its discretion in determining that the plaintiff provided 
prima facie
 evidence to support its claim.  
Weitekamp v. Lane
, 250 Ill. App. 3d 1017, 1023, 620 N.E.2d 454, 458 (1993).  The question before the reviewing court is whether there was a sufficient showing to sustain the trial court's order.  
Hartlein v. Illinois Power Co.
, 151 Ill. 2d 142, 157, 601 N.E.2d 720, 727 (1992).   Instead of deciding controverted facts on the merits of the case, the reviewing court determines only whether the plaintiff has demonstrated 
that there is a fair question as to the existence of the claimed rights;  that the circumstances lead to a reasonable belief that the plaintiff will probably be entitled to the relief sought;  and that the status quo should be preserved until the case can be decided on the merits.  
Hartlein
, 151 Ill. 2d at 157, 601 N.E.2d at 727. 

Existence of a Clearly Ascertainable Right

Mid-America contends that Delta failed to establish a clearly ascertainable right in need of protection.  To show a clear and ascertainable right, Delta must raise a fair question that it has a substantive interest recognized by statute or common law.  
Kilhafner v. Harshbarger
, 245 Ill. App. 3d 227, 229, 614 N.E.2d 897, 899 (1993).  The trial court found that the following information was protected under the Illinois Trade Secrets Act: (1) the Delta customer list; and (2) customer data, including the following list of information as taken directly from plaintiff's complaint: the needs or preferences of contact persons or decision-makers at such customers, the model numbers, identification numbers, and service histories of equipment located at each customer site, the terms of contracts for ongoing maintenance services, time and materials pricing to customers without service contracts or for services that went beyond those contracted for, information concerning customers' evolving needs as to upgrading equipment, contract expiration dates, and costs and profit margins for parts and services.  The trial court additionally found the following overlapping information to be trade secrets: (1) individual customer contacts; (2) the customer references of Delta; (3) the service list for customer equipment; (4) the contract terms; and (5) contract expiration dates.  O
n appeal, Delta has attempted to redefine and narrow its alleged trade secrets under the Illinois Trade Secrets Act (the Act) (765 ILCS 1065/2 
et
 
seq.
 (West 2000)), maintaining in its brief and at oral argument that it encompasses the following information
: (1) service contract terms; (2) pricing for service contracts and work done on a time-and-materials basis; (3) equipment service history; and (4) the identity of key customer contacts. 

 To set forth a violation of the Act, a plaintiff must establish that the information at issue was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business.  
Strata Marketing, Inc. v. Murphy
, 317 Ill. App. 3d 1054, 1068, 740 N.E.2d 1166, 1176 (2000).  Under section 2(d) of the Act (765 ILCS 1065/2(d) (West 2000)), a trade secret is defined as follows:

"[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."   

The following additional common law factors are significant in determining whether a trade secret exists: " '(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his [or her] competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[citation]' "  
ILG Industries, Inc. v. Scott
, 49 Ill. 2d 88, 93, 273 N.E.2d 393, 396 (1971).

The protection afforded trade secrets reflects a balancing of conflicting social and economic interests.  
Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means.  
ILG Industries, Inc.
, 49 Ill. 2d at 93, 273 N.E.2d at 396.
  Nevertheless, in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation.  
Service Centers of Chicago, Inc. v. Minogue
, 180 Ill. App. 3d 447, 452, 535 N.E.2d 1132, 1135 (1989).  We review the trial court's findings with these competing principles in mind.

Mid-America initially argues that the trial court erred in finding that the Delta customer list and data are trade secrets because they are publicly available and generally duplicated or accessible to others in the industry.  On appeal, Delta fails to address certain portions of the trial court's findings, including that its customer "list"  is a trade secret warranting protection under the Act.
  Where information can be readily duplicated without involving considerable time, effort or expense, it is not a trade secret.  
Hamer Holding Group, Inc. v. Elmore
, 202 Ill. App. 3d 994, 1011, 560 N.E.2d 907, 918 (1990).

In the present case, Delta presented no testimony at the hearing as to the amount of effort expended in acquiring its customer list.
  It is undisputed that the list as defined by exhibit 17 was generated by Delta during the litigation process and was not a "list" maintained as such by Delta in the regular course of business, nor did it contain any information other than the names of customer organizations with which it alleged it was doing business as of March 17, 2001.  It is also undisputed that the names of the 72 customers listed, including hospitals and medical clinics, could be derived by merely looking in the yellow pages or from a FOIA request.  It is further undisputed that the Lorad manufacturer provided its dealer,  Mid-America, with a list of its customers' addresses, phone numbers, the medical specialization, model number of the customer equipment purchased, the date of installation, and the installer of that equipment, including equipment installed by Delta.

Accordingly, because a list of Delta's Lorad customers can be duplicated with little effort, it was an abuse of discretion for the trial court to find that Delta presented a fair question that its customer "list" derived in preparation for the litigation was a protectable trade secret.  See 
Hamer Holding
, 202 Ill. App. 3d at 1001, 1011, 560 N.E.2d at 912, 919 (customer list not a trade secret where it could be easily duplicated by reviewing lists from Secretary of State's office, distilling it by geographic region, and updating contacts and telephone numbers); see also 
Office Mates 5, North Shore, Inc. v. Hazen
, 234 Ill. App. 3d 557, 576-77, 599 N.E.2d 1072, 1085 (1992); 
Carbonic Fire Extinguishers, Inc. v. Heath
, 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677-78 (1989).

On that basis alone, we are constrained to reverse the preliminary injunction order which barred Mid-America from soliciting 
any
 form of business from any Delta customer listed in exhibit 17 and barred Mid-America from using or disclosing the identities of Delta customers.  Additionally, it was an abuse of discretion for the trial court to bar Mid-America from using or disclosing to any person the model numbers and identification numbers of Delta customer equipment, as such information was proven to be in the public domain and therefore not a trade secret. 

We next consider whether Delta presented a fair question that its other customer data as argued in its brief, including pricing, service history, key decision-makers, and customer contract terms, constitute protected trade secrets.  In order to prove that its pricing formula constitutes a trade secret within the meaning of the Act, plaintiff must establish that the value of the pricing formula lies in the fact that its not generally known to others who could benefit by using it, or could not be acquired through general skills and knowledge.  
Service Centers of Chicago, Inc.
, 180 Ill. App. 3d at 454, 535 N.E.2d at 1136.  Mere knowledge of the profit desired by the employer does not constitute a trade secret.  
Springfield Rare Coin Galleries, Inc. v. Mileham
, 250 Ill. App. 3d 922, 934, 620 N.E.2d 479, 487 (1993).

 The testimony presented at the hearing revealed that Delta's pricing is a function of 
the type of equipment, the age of the equipment, the service history, including the use and maintenance of the equipment, and customer preferences.
   Much of this information would be readily available to Mid-America through the Lorad manufacturer's equipment list.  As stated previously, Lorad provides its dealers with information regarding the type of equipment purchased by the customer and when the equipment was installed.  From that list, defendants could also readily determine the age of the equipment.

Additionally, there was no evidence presented to show what data, if any, Delta compiled regarding individual customer preferences in its database or elsewhere, what the term "customer preferences" included
, or the time, effort, and expense in gathering this information.  Thus, the only information acquired by Mid-America with regard to customer preferences would come from Donati and Ottum's collective experience and skills obtained through working with those customers in the mammography equipment industry, which they were free to take with them into the marketplace.  
Midwest Micro Media, Inc. v. Machotka
, 76 Ill. App. 3d 698, 704, 395 N.E.2d 188, 192 (1979) (
"knowledge of the individual customers is closely akin to his personal skills and abilities as a salesman and thus cannot be considered plaintiff's property"). 
 

With respect to the service history of customer equipment, Delta directs our attention to the fact that this information is instrumental in developing a pricing strategy when soliciting new business and affects customer retention thereby creating economic value.  Delta notes that one of the primary considerations when selecting a service provider is the "knowledge of the equipment."   However, defendants cannot be compelled to erase from their minds the knowledge gained from working on a particular piece of equipment.  
ILG Industries, Inc.
, 49 Ill. 2d at 93-94, 273 N.E.2d at 396.  
Additionally, service history on a particular piece of equipment is only valuable to the competitor in this case to the extent that the piece of equipment is Lorad mammography equipment that has been serviced for a period of time and is currently being utilized.  The use and maintenance of a piece of equipment that is relatively new or no longer being utilized is irrelevant.  As such, Delta failed to present a fair question that the service history it compiled on its customers necessarily had current value to its competitors.

Moreover, service history was not a secret.  While there was evidence that customers may not routinely share contract terms and pricing, the only evidence presented with respect to sharing service history is that Delta would provide it to the customer if requested, and the only customer who testified at the hearing stated that she would share this information if she wanted to work with a particular provider.   Ultimately, Delta has not established a fair question that it can claim a property right in its customer's own service history.  Unlike in 
Elmer Miller, Inc. v. Landis
, 253 Ill. App. 3d 129, 625 N.E.2d 338 (1993), where customers did not disclose their personal fabric preferences and measurements to a competitor, or even to other plaintiff employees, and in fact called the plaintiff to complain that the competitor might have personal information, here the only customer to testify stated that she would share equipment service history information with any Lorad dealer if she wanted it to service Randallwood equipment.
  See also 
Springfield Rare Coin Galleries, Inc.
, 250 Ill. App. 3d at 930, 620 N.E.2d at 485 (data regarding customer financial information and credit history not a trade secret where credit references could be obtained directly from the customer).

We next address whether Delta raised a fair question that its service contract terms were sufficiently secret to derive economic value from not being generally known.  Delta directs our attention to the testimony that Delta's contracts were developed over many years after significant time and effort to incorporate customer needs and preferences and Delta's own business strategy.   Plaintiff asserts that the economic value of the contract is best illustrated by Donati's admission that he copied a blank contract for use in soliciting Delta's customers.

While this evidence may establish that the contract has economic value, plaintiff must also prove that the terms developed in the contract were not generally known in the industry.  
George S. May International Co. v. International Profit Associates
, 256 Ill. App. 3d 779, 788-89, 628 N.E.2d 647, 653-54 (1993).  While Donati acknowledged that he copied and used the Delta contract forms in soliciting new business, concepts such as an annual automatic-renewal clause, margins for overtime, and the establishment of various levels of service are not novel ideas.  Merely establishing a response to customer requests or being the first in the industry to integrate these concepts into its contract does not turn what otherwise would be general knowledge into a trade secret.  
Computer Care v. Service Systems Enterprises, Inc.
, 982 F.2d 1063 (7th
 Cir. 1992); 
George S. May International Co.
, 256 Ill. App. 3d at 789, 628 N.E.2d at 654.  

Furthermore, knowledge that a customer previously chose a particular level of service, i.e. preventative maintenance as opposed to preventative maintenance and labor and parts, cannot be a trade secret where it is the customer, and not Delta, that makes the choice regarding the level of service that best suits its needs at a particular time.  While proprietary information which is disclosed to a customer, where necessary for a business purpose, does not necessarily destroy the secret nature thereof (
ILG Industries, Inc.
, 49 Ill. 2d at 93, 273 N.E.2d at 396), this was the customer's own information.  Here Delta acknowledged that it cannot control what a customer does with its own information, and the customer who testified stated that she was not directed that such information was to be treated in confidence.   Moreover, at the point at which a customer would be choosing a type of service, it necessarily would have already decided to do business with that vendor, and the undisputed testimony was that when a customer chooses to work with a particular vendor, it will disclose this type of information.  See 
Office Mates 5, North Shore, Inc.
, 234 Ill. App. 3d at 575, 599 N.E.2d at 1084 (client information was not a trade secret where it could be obtained by asking questions designed to elicit the information requested).      

Lastly, we consider whether Delta has established a fair question that Mid-America's knowledge of key contact persons within the organization is a trade secret.  Delta did not present any list of contact persons that it had compiled.  Rather, the evidence Delta directs us to is that Ottum had compiled his own address book of customers' names, addresses, and some contact persons, which he had maintained since beginning in the business in 1992, preceding his employment with Delta, and downloaded it onto his Palm Pilot.  He used this information to solicit business for Mid-America.   

While Krause made several general assertions that gaining an audience with the decision-maker was difficult, there was no specific or tangible evidence presented to suggest that this information is nothing more than the kind of knowledge any successful service engineer necessarily acquires through experience and relationships with the customer.  Indeed, LaBrasca testified that it was experience in the business that was helpful in ascertaining this information.  Nor was there evidence to suggest that Delta, as the employer, engaged in any effort beyond that ordinarily exerted by its service engineers in developing customer contacts.  There was no evidence that Delta had spent a great deal of time, energy, and effort in nurturing these relationships.  See generally 
Millard Maintenance Service Co. v. Bernero
, 207 Ill. App. 3d 736, 566 N.E.2d 379 (1990) (court found plaintiff had a protectable near-permanent relationship where employer had a restrictive covenant, he and employees maintained daily contact with key customer personnel, employees maintained a daily presence on customer premises, employer nurtured relationships through social outings, and had relationship in excess of 15 years).   

Here, instead, the evidence revealed that customer contacts were a product of the relationship developed with the service engineers.   Furthermore, nothing prevented Delta from guarding its interests by a restrictive covenant, and no affirmative measures were taken to specifically protect the contacts Ottum maintained in his address book.  As aptly stated in 
Fleming Sales Co., v. Bailey
, 611 F. Supp. 507, 514-515
 (N.D. Ill. 1985)
, "it would be unfair to allow an employer without such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market."

Cross Appeal

Accordingly, we need not address Mid-America's additional contentions on appeal, but focus instead only on those portions of Delta's cross-appeal relevant to a disposition of this matter.
  
 
Delta contends that it was against the manifest weight of the evidence for the trial court to find that it failed to present a sufficient showing that Donati and Ottum breached their duty of loyalty or tortiously interfered with a contract or an economic advantage.  Initially, we note that Delta makes no argument and cites no authority as to what evidence supports its claim of tortious interference with prospective economic advantage, and we therefore do not address it.  188 Ill. 2d R. 341(e)(7).  Furthermore, to the extent that these claims involve an alleged misappropriation of Delta's trade secrets, they are preempted by the Act.  765 ILCS 1065/8 (West 2000).       

 To state a cause of action for tortious interference with an existing contract, a plaintiff must allege:  (1) the existence of a valid and enforceable contract between plaintiff and another;  (2) defendant's awareness of the contractual obligation;  (3) defendant's intentional and unjustified inducement of a breach of contract;  (4) a subsequent breach by the other caused by defendant's wrongful conduct;  and (5) damages.  
Indeck North American Power Fund, L.P. v. Norweb PLC
, 316 Ill. App. 3d 416,
 431, 735 N.E.2d 649, 661 
(2000).

Delta alleged in its complaint that Mid-America persuaded Kishwaukee to request a modification of the terms of their contract to allow Mid-America to acquire its business before Kishwaukee's contract with Delta would have otherwise terminated.  The evidence presented revealed only that 
Kishwaukee representative Paul Andresen was a long-time friend of Robert Ottum, that he had a right to amend and terminate his contract, and that he chose to because of his long-standing relationship with Robert Ottum and experience with Mid-America employees.  There was no evidence presented to support a breach of contract on the part of Kishwaukee.  
Accordingly, the trial court did not err in denying the preliminary injunction on that basis.      

Generally, employees may plan, form, and outfit a competing corporation while still working for the employer, but they may not commence competition.  In the absence of fraud, a contractual restrictive covenant, or the improper taking of a customer list, former employees may compete with their former employers and solicit former customers provided there was no demonstrable business activity before termination of their employment.  
 
Dowell v. Bitner
,  273 Ill. App. 3d 681, 691, 652 N.E.2d 1372, 1379 (1995).    The trial court found that there was insufficient evidence to suggest that Donati or Ottum breached his duty of loyalty
 in failing to procure the Randallwood contract.  
This finding was not against the manifest weight of the evidence where it was unclear from the record why Donati and Ottum were required to sign Randallwood to a new contract with Delta when its contract specifically stated it was to be automatically renewed and where there was no other evidence of pretermination solicitation of this business.
  Syzmanski stated that she chose to do business with Mid-America because of the relationship she had with the service engineers that worked on her equipment and the relationship she had with Robert Ottum.

Finally, we note that i
n reviewing the result reached by the trial court, we are not determining conclusively that Delta cannot further maintain a cause of action at trial, or that it possesses no trade secrets under the Act, but rather we are determining that the trial court abused its discretion in granting the requested injunction.  We merely find that Delta failed to make a sufficient showing to sustain the preliminary injunction.  

Accordingly, we reverse and remand for further proceedings on the merits.   

Reversed and remanded.  

HOFFMAN, P.J., and HARTMAN, J., concur.