**APPLIED INDUSTRIAL MATERIALS CORPORATION, a Delaware corporation, Plaintiff,**

v.

**Robert C.A. BRANTJES, Defendant.**

**No. 94 C 6921.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 13, 1994.

Robert J. Rubin, Robert Joseph Mendes, Altheimer & Gray, Chicago, IL, for Applied Indus. Materials Corp.

Howard P. Kamin, Randall B. Gold, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for Robert C.A. Brantjes.

*MEMORANDUM OPINION
AND ORDER*

HOLDERMAN, District Judge:

On November 14, 1994, plaintiff Applied Industrial Materials Corporation ("Aimcor") commenced this action in the Circuit Court of Cook County, Illinois against defendant Robert C.A. Brantjes ("Brantjes"). On November 18, 1994, defendant Brantjes removed the action to this court pursuant to 28 U.S.C. § 1446. No motion to remand under 28 U.S.C. § 1447 has been filed.

This federal court's subject matter jurisdiction is premised upon 28 U.S.C. § 1332 since the parties are citizens of different states and the amount in controversy exceeds $50,000.00 exclusive of interests and costs. Venue in this district under 28 U.S.C. § 1391 is undisputed by the parties.

Plaintiff Aimcor has moved for a preliminary injunction against defendant Brantjes. The court has reviewed the materials submitted regarding plaintiff's motion. The court offered the parties the opportunity to call witnesses if they desired at a hearing on December 2, 1994 during which the court heard both plaintiff's counsel and defendant's counsel in oral argument. Both parties declined to call witnesses and relied instead on their written submissions as to the facts.[1] The parties provided the court additional written submissions on December 5, 1994 which the court has reviewed. For the reasons stated herein, plaintiff's motion for preliminary injunction is denied.

*FINDINGS OF FACT*

I. *The Parties*

Plaintiff Aimcor is a Delaware corporation with its principle place of business in Colorado. For several years as part of Aimcor's business it has been engaged in the buying and selling of fluid petroleum coke ("Coke"), a by-product in the refinery of crude oil.

Defendant Brantjes was employed by Aimcor, or its predecessor companies, from March 1, 1974 through June 30, 1990. Brantjes was Aimcor's Vice President, Sales and Logistics, from November 1, 1986 through June 30, 1990. Brantjes became a shareholder of Aimcor on September 1, 1988 at which time Brantjes and AIMCOR Holdings, Inc. entered into a contract entitled Shareholder's Agreement. A copy of that Shareholder's Agreement is attached to Aimcor's Verified Complaint for Injunctive and Other Relief as Exhibit "A." In June 1989, AIMCOR Holdings, Inc. merged into Aimcor. By this merger, Aimcor succeeded to all of the rights and obligations that AIMCOR Holdings, Inc. had under the Shareholder's Agreement with Brantjes.

Pursuant to Section 5.2 of the Shareholder's Agreement, Brantjes agreed that he would not disclose any of Aimcor's confidential information:

> 5.2 *Confidentiality* ....  [Brantjes] agrees that ..., for the longest period permitted by law after termination of [his] employment for any reason, [Brantjes] shall hold in strictest confidence, and shall not ... use for the benefit of himself or any third party or disclose to any person, firm corporation outside of AIMCOR .. any "Confidential Information".

Section 5.2 of the Shareholder's Agreement defined "Confidential Information" broadly to include anything "protectible as a trade secret under the Illinois Trade Secrets Act," 765 ILCS 1065/1 *et seq.* ("Act"), and specifically defined it to include any information regarding Aimcor's marketing plans and strategies, Aimcor's finances and business records, the purchase and payment patterns of Aimcor's customers, and any other information that Brantjes was told, or reasonably ought to have known, that Aimcor regards as confidential. In Section 5.3 of the Shareholder Agreement, Brantjes agreed to injunctive relief among other remedies being accorded

1. The parties had determined that the absence of significant factual disputes eliminated the need for an evidentiary hearing on this motion. *See Floralife, Inc. v. Floraline International, Inc.,* 633 F.Supp. 108, 116–17 (N.D.Ill.1985); *Securities and Exchange Commission v. Cherif,* No. 89 C 4904, 1989 WL 119061, at *1 (N.D.Ill. Sept. 8, 1989), *aff'd and remanded,* 933 F.2d 403 (7th Cir.1991) (preliminary injunction "may be granted without an evidentiary hearing, where there is no serious factual controversy") (citing *Spartacus Youth League v. Board of Trustees of the Illinois Industrial University,* 502 F.Supp. 789, 805 (N.D.Ill.1980)).

Aimcor in the event of his breach of Section 5.2. (Exhibit A, p. 19, to Exhibit 1 of Plaintiff's Motion for Preliminary Injunction.)

## II. *Pertinent Business Dealings*

For the past twenty-five years, Aimcor, or its predecessor companies, has had a business relationship with Onoda Cement ("Onoda") and Mitsubishi Corporation ("Mitsubishi") whereby Onoda, using Mitsubishi as its importing trading company, bought quantities of Coke from Aimcor for use in Japan. Aimcor bought the Coke that it has sold to Onoda from a refinery in Benicia, California that is owned and operated by Exxon Company, U.S.A. ("Exxon").

Since about 1969, Aimcor, or its predecessor companies, has bought and then sold to Onoda, through Mitsubishi, all of the Coke produced for export at Exxon's Benicia refinery. At all times Exxon knew that Aimcor was reselling the Coke it had purchased from Exxon to Onoda. In recent years, Onoda purchased from Aimcor in excess of 200,000 metric tons of Benicia Coke per year for use in Japan.

As described in the Additional Certified Statement of Peter Scott–Hansen, the President of Aimcor's Carbon Groups, which was filed December 5, 1994, Aimcor renegotiated prices relating to the purchase and sale of Coke from Benicia, California once a year. This annual renegotiation process has involved two sets of negotiations—one with Exxon for the price Aimcor will pay for Coke and the other with Onoda for the price Aimcor will receive for Coke. The two sets of negotiations have been inextricably tied to one another. Each time Aimcor has renegotiated its deal with either Exxon or Onoda, Aimcor has also renegotiated its deal with the other. (¶, Scott–Hansen, 12/5/94 Statement.) The price Aimcor has received from Onoda for Coke has been based on a price per metric ton. While the actual price per metric ton of Coke has varied from year to year, Aimcor's profit margin in connection with the purchase and sale of Benicia Coke has in one year since 1990 remained unchanged from the previous year's profit margin, while in other years it has increased and in at least one year it has decreased. (¶¶ 3–

4, Scott–Hansen, 12/5/94 Additional Certified Statement.)

While working at plaintiff Aimcor, defendant Brantjes was familiar with: (a) all negotiations, contracts and other contacts with Onoda, Mitsubishi and Exxon in connection with the purchase and sale of Benicia Coke; and (b) the price Aimcor paid Exxon for Coke, Aimcor's costs in selling Coke to Onoda through Mitsubishi, the amount Aimcor was paid for Coke, the net profit level Aimcor earned from its Benicia Coke operations and all other details regarding the Benicia Coke operations as of the day Brantjes left Aimcor's employ, June 30, 1990. Aimcor considers all this information to be trade secret information protected by the Illinois Trade Secrets Act.

There are no publications, newsletters, services or other sources that publish or make known the price of Coke. Other than speaking directly to a particular producer or user, there is no way to determine the accuracy of price or profit margin information regarding Coke. (¶ 6, Scott–Hansen, 11/29/94 Certified Statement.)

Since leaving Aimcor on June 30, 1990 Brantjes has not been privy to any of Aimcor's information concerning the prices Aimcor has resold or the conditions under which Aimcor has resold the Coke it purchased from Exxon to Onoda. After leaving Aimcor, Brantjes became president of Clemens Consulting, Inc. of Garrison, New York.

In or about November, 1993, Brantjes met in Brussels, Belgium with a representative of Onoda at the Cembureau Conference. Brantjes testified in his December 2, 1994 affidavit:

> At no time, including the November 1993 meeting in Brussels, did I ever disclose any confidential pricing or any other confidential information to Exxon or Onoda concerning Amicor [sic], its pricing, or its Benicia Coke operation. (¶ 5.)

In December, 1993, Exxon approached Brantjes and advised Brantjes that it, Exxon, wished to sell Coke directly to end-user customers. Exxon at that time asked Brantjes because of his long-standing friendly relationship at Onoda, to ascertain from Onoda

whether Onoda would be interested in dealing directly with Exxon.

On January 19, 1994, Brantjes, on Exxon's behalf, met with the Purchasing Department Officials of Onoda in Tokyo. At that meeting the Onoda officials expressed the belief that "times had changed and that old traditional channels were not necessarily in the interest of the consumers in Japan." Onoda told Brantjes its 1993 contract purchase prices for Australian Coal, Russian Anthracite and Exxon Fluid Coke. Brantjes reported that information to Exxon in a memorandum (Exhibit B to Brantjes 11/22/94 Affidavit). In the memorandum reporting on that January 1994 Tokyo meeting both Onoda and Brantjes also stated:

Aimcor has asked for a sizable price increase for the new fiscal year (1994) which has been refused by Onoda based on the above calculation. Since Onoda suspects that there is a considerable mark up from the level Exxon charges Aimcor, they are interested in starting negotiations with Exxon already for this coming financial year.

In January, 1994, at a meeting between representatives of Exxon and Aimcor, Exxon told Aimcor that it was unhappy with what it perceived to be the level of profit Aimcor was making on the sale of Benicia Coke to Onoda through Mitsubishi. Exxon implied that Aimcor should pay more money per ton to Exxon for the Benicia Coke. Aimcor explained its position to Exxon and subsequently offered to increase the price Aimcor paid Exxon for the sales year beginning April 1, 1994. Exxon accepted this offer. In its twenty-five year relationship with Aimcor, Exxon had never before communicated to Aimcor any displeasure concerning Aimcor's business relationships with Onoda and Mitsubishi.

On or about March 19, 1994, Exxon gave Aimcor a twelve-month notice that Exxon was cancelling its Benicia Coke contract with Aimcor. Exxon has declared that, effective April, 1995, it will no longer sell Benicia Coke to Aimcor.

On May 6, 1994, Clemens Consulting, Inc., defendant Brantjes' current employer, entered into a consulting agreement with Exxon. That consulting agreement includes the following provision:

Exxon does not wish to receive any information or materials from Consultant [Brantjes] which Exxon is obligated to hold in confidence. Accordingly, Consultant [Brantjes] agrees that it will not disclose to Exxon any information or materials which it deems proprietary. In the event Consultant [Brantjes] should see any need to disclose to Exxon information which Consultant [Brantjes] deems proprietary, Consultant [Brantjes] shall so notify Exxon in writing identifying the nature of the information and shall give Exxon an opportunity to determine whether it wishes to receive the information. In the absence of an express written agreement to the contrary, Exxon shall have no obligation of confidentiality regarding any information received from Consultant [Brantjes].

Defendant Brantjes in his affidavit dated November 18, 1994 stated under oath that he has never disclosed to Exxon and that Exxon has never requested that he disclose any proprietary information or trade secrets concerning Aimcor or its sales to Onoda. (Defendant Brantjes 11/18/94 Affidavit).

In May, 1994, Brantjes traveled to Japan on behalf of Exxon and conducted private negotiations with Onoda to sell Benicia Coke directly from Exxon to Onoda. Brantjes was accompanied on this trip to Japan by another representative of Exxon. Exxon has informed Aimcor that, prior to May, 1994, Exxon never negotiated directly with Onoda.

In September, 1994, Exxon informed Aimcor that Exxon had concluded a contract with Onoda for the sale of Benicia Coke beginning in April 1995.

Brantjes is scheduled to meet further with Onoda in Japan on behalf of Exxon later this month, December 1994, regarding the future sale of Benicia Coke by Exxon directly to Onoda.

## ANALYSIS

The scope of the preliminary injunction which plaintiff Aimcor seeks against defen-

dant Brantjes, as evidenced by the language of the proposed order submitted for this court's consideration, is an order:

1. prohibiting Brantjes from disclosing or using any of Aimcor's confidential information or trade secrets;

2. requiring Brantjes to terminate any employment or consulting relationship he has or will have with Exxon Company, U.S.A. or any related entity;

3. prohibiting Brantjes from traveling to Japan on behalf of Exxon to meet with Onoda and prohibiting Brantjes from engaging in any conduct whatsoever in furtherance of a relationship between Exxon and Onoda; and

4. prohibiting Brantjes from further interfering with Aimcor's present and future business relationships with Exxon, Onoda or Mitsubishi.

(Plaintiff's Proposed Order, p. 10.)

■■■ As reaffirmed by the Seventh Circuit earlier this year in *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir.1994), a preliminary injunction is warranted if the movant can make a threshold showing that:

(1) the case has some likelihood of success on the merits;

(2) no adequate remedy at law exists; and

(3) the movant will suffer irreparable harm if the injunction is not granted.

If these three conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently. This balancing by the court involves a "sliding scale" analysis: the greater the movant's chance of success on the merits, the less strong a showing the movant must make that the balance of harms is in movant's favor. In addition the court must consider the public interest in deciding whether the injunction is to be granted or denied. *See e.g., Nalco Chemical Co. v. Hydro Technologies, Inc.*, 984 F.2d 801, 802 (7th Cir.1993); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992). The court has considerable discretion in deciding whether to issue a preliminary injunction, *Computer Care v. Service Systems Enterprises*, 982 F.2d 1063,

1067 (7th Cir.1992), and its decision will be reversed only for an abuse of that discretion, an erroneous conclusion of law, which is subject to a *de novo* review, *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994), or a clearly erroneous finding of fact. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 844 (7th Cir.1994); *Cf. Cooter & Gell v. Hartmarx*, 496 U.S. 384, 405–06, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990).

I. *Plaintiff's Likelihood of Success on the Merits*

The primary authority for plaintiff's injunction motion is the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.* Indeed the only trade secret misappropriations plaintiff Aimcor can enjoin defendant Brantjes from committing are those which would violate plaintiff's rights under the Illinois Trade Secrets Act ("Act"). The protections contemplated by the 1988 Shareholder's Agreement between the parties is premised upon the Act. Pursuant to section 8 of the Act, common law torts for trade secret theft or misappropriation were abolished as of the Act's effective date of January 1, 1988. *See Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir.1992). Pursuant to section 3(a) of the Act, a trade secret's "actual or threatened misappropriation may be enjoined." Therefore, if a violation of the Act is shown, an injunction should be entered. *See e.g., ISC Bunker Ramo Corp. v. Altech*, 765 F.Supp. 1310 (N.D.Ill.1990). Under the terms of the Shareholder Agreement and the Act, unless plaintiff Aimcor can establish by the requisite burden of proof that defendant Brantjes' conduct or threatened conduct constitutes a violation of the Act, plaintiff has not proven a likelihood of success on the merits of its claim.

■■■ The threshold showing of likelihood of success on the merits need only be established by a standard of better than negligible. *See e.g., Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1066 (7th Cir.1994). Moreover, if a plaintiff seeking a preliminary injunction cannot show that the chance of prevailing on the merits is "better than negligible," a court must deny the injunction regardless of how heavily any other equities

may weigh in the plaintiff's favor. *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 307 (7th Cir.1992).

The initial inquiry in analyzing the issue of the plaintiff's likelihood of success on the merits in this case must begin with a review of the Act's provisions. Section 2 of the Act contains definitions of the Act's terms. The two definitions which are most important to this court's determination of whether the information the plaintiff claims amounts to trade secrets within the ambit of the Act's protection, are the Act's definitions of the term "trade secret" [2] and the term "misappropriation" [3].

Looking first to the term "misappropriation" and applying it to the facts, plaintiff Aimcor makes no claim that defendant Brantjes acquired the information by "improper means" [4] in violation of section 2(b)(1) of the Act. Therefore, the "disclosure or use" prong set forth in section 2(b)(2) is the alleged misappropriation plaintiff is seeking to enjoin. The facts appear clear that the information plaintiff seeks to keep defendant Brantjes from disclosing or using was "acquired [by Brantjes] under circumstances giving rise to a duty to maintain its secrecy or limit its use," Section 2(b)(2)(A)(II). Consequently, it appears that if the items of

information defendant Brantjes has either disclosed or used or is threatening to disclose or use constitute "trade secret" information the plaintiff would be well on the way toward establishing a better than negligible chance of success on the merits of plaintiff's claim.

█ Distilled to its essence, plaintiff Aimcor contends that the prices it paid Exxon and charged Onoda for the Benicia Coke as well as Aimcor's net of profit between those two prices are trade secrets within the meaning of the Act. In reviewing whether the prices and price information the plaintiff claims to be trade secrets are so, the court must determine whether that information in fact fits within statutory prerequisites of the Act. The focus falls initially on Section 2(d)(1). The question then becomes whether the price information for which plaintiff seeks the Act's protection is "sufficiently secret to derive economic value ... from not being generally known to other persons who can obtain economic value for its disclosure or use," Section 2(d)(1). Illinois courts applying the Act have answered this question in the negative as to information regarding prices charged to customers.

Indeed, the Illinois appellate courts which have addressed the issue have consistently

**2.** Section 2(d) of the Act, 765 ILCS 1065/2(d), defines "trade secret" as follows:

(d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

**3.** Section 2(b), 765 ILCS 1065/2(b), defines "misappropriation" as follows:

(b) "Misappropriation" means:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**4.** Section 2(a), 765 ILCS 1065/2(a), defines "improper means" as follows:

(a) "Improper means" includes theft, bribery, misrepresentation, breach of inducement or a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. Reverse engineering or independent development shall not be considered improper means.

held that price information which is disclosed by a business to any of its customers, unlike a unique formula used to calculate the price information which is not disclosed to business's customers, does not constitute trade secret information protected by the Act. *See e.g., Carbonic Fire Extinguishers v. Heath,* 190 Ill.App.3d 948, 547 N.E.2d 675, 678, 138 Ill.Dec. 508, 511 (2d Dist.1989); *cf. A.J. Dralle, Inc. v. Air Technologies,* 255 Ill. App.3d 982, 627 N.E.2d 690, 698, 194 Ill.Dec. 353, 361 (2d Dist.1994); *Label Printers v. Pflug,* 206 Ill.App.3d 483, 564 N.E.2d 1382, 1390–91, 151 Ill.Dec. 720, 728–29 (2d Dist. 1991).

The reasoning of the holdings of the above-cited Illinois appellate courts, each of which have denied injunctive relief to the respective plaintiffs as to information about prices charged, is essentially as articulated in the *Carbonic Fire Extinguishers* opinion authored by Justice (now Federal District Judge) Reinhard reversing the injunctive relief ordered by the trial court under the Act:

> The price information here ... was available to the various customers to which it pertained. As such those customers were at liberty divulge such information to a competitor of plaintiff's or anyone for that matter. *Carbonic Fire Extinguishers, supra,* 547 N.E.2d at 678, 138 Ill.Dec. at 511.

Plaintiff Aimcor relies primarily on two cases, *Millard Maintenance Service Co. v. Bernero,* 207 Ill.App.3d 736, 566 N.E.2d 379, 152 Ill.Dec. 692 (1st Dist.1990) and *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3rd Cir.1985), to support its position that the price it has paid Exxon and the price it has charged Onoda for Benicia Coke should be considered trade secrets protected by the Act. (Plaintiff's Reply Memorandum, p. 6.) The court initially notes that neither of these cases applied the provisions of the Illinois Trade Secrets Act. Second, both cases are factually distinguishable because both cases determined that pricing information, *i.e.* information used internally by a company to arrive at a price for a product, as opposed to the price itself, should be considered confidential. Indeed, the Third Circuit in *SI Handling Systems, supra,* stated in granting protection under Pennsylvania common law to "costing" and "pricing" information:

> Thus, unlike the price of [the product] this is not information that is readily obtainable by anyone in the industry.

It should be noted also that section 2(d)(2) requires those who seek the Act's protection to make "efforts to maintain its [the information's] secrecy or confidentiality." This is the other necessary prerequisite for trade secret status and it is not met when price information is disclosed to a customer. Both Exxon, plaintiff Aimcor's supplier, and Onoda, plaintiff Aimcor's customer, for the Benicia Coke were free to disclose the prices of their respective contracts to anyone. According to the evidence that is what happened here. Both Exxon and Onoda have disclosed their current contract prices for Benicia Coke to Brantjes.

Plaintiff Aimcor claims that, in addition to the actual prices, the price differential or net profit it derived from the purchase and sale of Benicia Coke is a trade secret. This argument has some appeal at first blush since it does appear to comport, unlike the disclosed prices, with the requirement of secrecy maintenance of section 2(d)(2) of the Act. Yet, even accepting the fact that Aimcor has maintained the confidentiality of its profit margins for the sales of Benicia Coke which it negotiated annually, plaintiff Aimcor still has not established likelihood of success on the merits of its claims under the Act because the information Brantjes obtained during his employment with Aimcor, which ended in 1990, is so outdated that it lacks current economic value.[5]

It is undisputed that the last Aimcor net profit figure that defendant Brantjes was apprised of by Aimcor, was for a contract that ended March 1991. Since that time, four different annual contracts have been negotiated by Aimcor with Exxon for the purchase of Benicia Coke and four annual contracts have been negotiated by Aimcor

---

**5.** It should be noted that Brantjes' obligations under the "Restrictive Covenant" provision, section 5.1 of the Shareholder's Agreement existed for only two years and ended in 1992 well before any of the alleged conduct of which plaintiff Aimcor now complains occurred.

with Onoda for the sale of Benicia Coke. The price differential or profit margin information defendant Brantjes obtained in 1990 is historical at best. Although plaintiff Aimcor claims that over time its net profit has been relatively the same year to year, defendant Brantjes has not been shown that information as to the last four years. The profit margin information from 1990 and prior years is just too old to have continued economic value especially in the light of the annual fluctuations in Aimcor's profit margins on Benicia Coke as disclosed in plaintiff Aimcor's submission to this court of December 5, 1994. (¶ 4, Scott–Hansen 12/2/94 Additional Certified Statement).

Aside from the lack of economic value due to the age of the information Brantjes obtained from Aimcor, there has been no proof that Brantjes has disclosed or used that 1990 Aimcor information in any manner or has threatened to do so. Plaintiff has offered no evidence that contradicts Brantjes sworn denials of any use or disclosure by him. Other than the plaintiff's arguments based on the years of Aimcor's dealings with Exxon and Onoda, plaintiff has offered nothing in evidence to support its position as to any misappropriation by Brantjes. The effect of Aimcor's circumstantial evidence is greatly diminished by the proof presented by Brantjes as to his contacts with Exxon and Onoda. The consulting agreement between Brantjes and Exxon prohibits disclosure of trade secret information. Brantjes' memorandum of the meeting with Onoda in which Onoda freely disclosed not only the price Onoda paid to Aimcor, but also to others, shows it was Onoda not Aimcor from which Brantjes obtained information about prices.

Having evaluated the facts and the law, this court finds based on this record that plaintiff Aimcor does not have a better than negligible chance of success on the merits of its claim premised upon the Illinois Trade Secrets Act.

## II. *Other Elements of Injunctive Relief*

This court need not address the other elements necessary for the granting of plaintiff's request for a preliminary injunction such as the existence and adequacy of any legal remedy, the balance of the respective harm to the parties resulting from the court's either granting or denying plaintiff's requested preliminary injunction, and the public interest. Regardless of how heavily the other equities would weigh in plaintiff's favor if the court were to evaluate and balance them, plaintiff's preliminary injunction motion has to be denied because plaintiff has failed to cross the first requisite threshold of a better than negligible chance of success on the merits. *Vencor, Inc. v. Webb,* 33 F.3d 840, 846 n. 4 (7th Cir.1994); *Illinois Council on Long Term Care v. Bradley,* 957 F.2d 305, 307 (7th Cir.1992). Even if plaintiff had some likelihood of success on the merits, applying the "sliding scale" analysis, this court cannot say that the plaintiff's likelihood when coupled with the irreparable harm plaintiff would suffer if plaintiff had to wait until trial for relief does not outweigh the irreparable harm defendant would suffer from a granting of plaintiff's motion. Additionally, it appears any harm a denial of plaintiff's injunction request may cause to plaintiff would be quantifiable in money damages and an adequate legal remedy exists.

In light of the substantial breadth of the proposed preliminary injunction requested by plaintiff Aimcor in its submitted proposed order (Plaintiff's Proposed Order, p. 10) quoted on pages 435 and 436 of this opinion *infra,* the court reminds the parties that the breadth of any requested injunction should not go beyond the need to protect the legitimate interests of the plaintiff and should not unduly burden the defendant, *see American Can Co. v. Mansukhani,* 814 F.2d 421, 426 (7th Cir.1987); *Elmer Miller, Inc. v. Landis,* 253 Ill.App.3d 129, 625 N.E.2d 338, 343, 192 Ill.Dec. 378, 383 (1st Dist.1993), and not impose undue costs on non-parties, *see Walgreen Co. v. Sara Creek Property Co. B.V.,* 966 F.2d 273, 275–77 (7th Cir.1992).

Terminating Brantjes' consulting relationship with Exxon, prohibiting his travel to Japan to meet Onoda, or precluding him from engaging in other lawful conduct (Plaintiff's Proposed Order at p. 10 quoted at page 436 of this opinion, *infra* ) would appear to exceed the permissible scope of lawful pre-

liminary injunctive relief even if Brantjes' conduct were shown to have violated the Act.

## CONCLUSION

For the reasons stated herein, plaintiff's motion for preliminary injunction is DENIED.

Defendant is to file an answer in conformance with Local General Rule 9(a) of the Northern District of Illinois on or before December 21, 1994. The parties are urged to discuss settlement and report on the status thereof on January 19, 1995 at 10:00 a.m.