**UNISOURCE WORLDWIDE, INC., Plaintiff,**

v.

**Chester D. CARRARA, Richard W. McCormick, Michael J. McCormick, Daniel J. Cady, David M. Schaidle, Paul F. Hetman, Jeffrey W. Lichtenberger, and Brenda L. Baker, Defendant.**

No. 03–1015.

United States District Court, C.D. Illinois.

Feb. 19, 2003.

Michael Levinson, Charles Chejfec, Andy Clark, Seyfarth & Shaw, Chicago, IL, for Plaintiff.

John Dickman, Kevin Cloutier, William Miossi, Winston & Strawn, Chicago, IL, J. Reed Roesler, Davis & Campbell, Peoria, IL, for Defendants.

### ORDER

MIHM, District Judge.

Plaintiff Unisource Worldwide, Inc. (Unisource) has sought a preliminary injunction in this case to prevent the Defendants from breaching their covenants not to compete with Unisource and disclosing Unisource's trade secrets and confidential information.

A preliminary injunction is warranted if the movant can demonstrate: (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, (3) irreparable harm if preliminary relief is denied that outweighs the irreparable harm the non-moving party will suffer if the injunction is granted, and (4) public interest. *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996).

The Court finds that Unisource has not established a reasonable likelihood of success on the merits. Therefore, the other factors are moot, and the Motion for a Preliminary Injunction [# 3–2] is DENIED, and the Temporary Restraining Order previously entered by the Court is dissolved.

### Background

Unisource is a national distributor of printing and imaging papers, packaging, and facility supplies and equipment with over two hundred locations. It operates a sales facility in Morton, Illinois, and a customer service facility in St. Louis, Missouri.

The printing and paper products sales business is intensely competitive. Many companies offer products and services similar to Unisource. Unisource relies upon its sales force to provide face-to-face service to its customers before and after the sale. Unisource's sales representatives and customer service employees develop personal acquaintances with Unisource's current and prospective customers. The sales representatives analyze the customers' unique printing and paper needs, and tailor their services to solve each individual customer's needs.

Defendants Chester Carrara (Carrara), Richard McCormick, and Michael McCormick were Unisource sales representatives employed at Unisource's Morton, Illinois facility. Their duties included soliciting existing and prospective Unisource customers to determine their needs, generating new sales opportunities, tracking customer purchasing over time to anticipate customers' future requirements, and following up with customers after sales.

Defendants David Schaidle (Schaidle) and Daniel Cady (Cady) were Unisource customer service employees operating out of Unisource's St. Louis, Missouri facility. They were responsible for executing orders generated by Unisource's sales representatives. Unisource customers frequently call customer service employees directly with their paper and printing needs.

Defendant Jeffrey Lichtenberger (Lichtenberger) was a Unisource product specialist operating out of Unisource's St. Louis, Missouri, facility. He was responsible for dealing with the vendors from whom Unisource purchased many of its products.

Defendant Paul Hetman (Hetman) was a Unisource packaging equipment technician operating out of Unisource's Morton, Illinois, facility. His primary responsibility was to visit Unisource customers to ensure that their Unisource products were functioning properly.

Finally, Defendant Brenda Baker (Baker) was a Unisource administrative assis-

tant at Unisource's Morton, Illinois, facility. She assisted Carrara and others.

Baker resigned from Unisource effective December 20, 2002. Carrara, Richard McCormick, and Michael McCormick resigned from Unisource effective December 31, 2002. Cady and Schaidle resigned from Unisource effective January 3, 2003. Each of these Defendants subsequently commenced working for Midland Paper Company—a competitor of Unisource in Bloomington, Illinois—where at least some of the Defendants, including Carrara, Michael McCormick, and possibly Richard McCormick, began soliciting and calling upon customers they had worked with while employed at Unisource.

Each of the Defendants had signed employment agreements with Unisource. Four contained covenants not to compete. All eight contained provisions restricting disclosure of Unisource' confidential information. Two contained provisions prohibiting the Defendants from soliciting or hiring Unisource employees.

Unisource asserts that the Defendants' conduct is in breach of their respective employment contracts. Unisource also argues that all eight of the Defendants were privy to confidential information and trade secrets while employed at Unisource, which they are now misappropriating to obtain the business of Unisource's former customers.

On January 21, 2003, this Court entered a temporary restraining order prohibiting the Defendants from soliciting business or taking new orders from certain customers. On February 11–12, 2003, the Court held a preliminary injunction hearing. This Order follows.

## Discussion

### I. Defendants' Employment Contracts with Unisource

#### A. Choice of Law

The parties agree that Illinois law governs the contracts with Carrara, Richard McCormick, David Schaidle, Daniel Cady, Jeff Lichtenberger, and Paul Hetman. The parties agree that Missouri law governs the contract with Michael McCormick. Finally, the parties agree that Georgia law governs the contract with Baker.

#### B. Assignability

Carrara and Michael McCormick each had an employment contract with a company called Distribix, which subsequently merged with Unisource. They argue that their contracts with Distribix were never assigned to Unisource, and therefore that Unisource cannot enforce them.

The Court adopts the rationale regarding this issue applied in *AutoMed Technologies, Inc. v. Eller*, 160 F.Supp.2d 915, 924 (N.D.Ill.2001). In that case, Judge Moran noted that, since courts scrutinize restrictive covenants closely and will uphold them only to the extent they are reasonable and necessary to protect an employer's legitimate business interest, an employee will not be prejudiced by having the contract assigned to a successor business.

Carrara and Michael McCormick are primarily concerned with the fact that Unisource has a vastly greater number of product lines and locations than Distribix had, which would impose much greater limitations on their freedom to compete under the terms of their contracts.[1] Because this Court will only uphold the provisions to the extent they are reasonable and

1. According to Carrara's testimony, Distribix had fifteen product lines and seven locations, while Unisource has over fifty product lines and over two hundred locations.

necessary, however, Carrara's and Michael McCormick's concern is adequately addressed.

Furthermore, where an employment contract is silent on this issue—as Carrara's and Michael McCormick's are—courts generally find that an acquiring corporation can enforce the acquired company's restrictive covenants. *See Hexacomb Corp. v. GTW Enter.*, 875 F.Supp. 457, 464 (N.D.Ill.1993). Therefore, the Court finds that Unisource can enforce Carrara's and Michael McCormick's contracts with Distribix.

## C. Enforceability of Covenants Not to Compete

▮▮▮ The employment agreements of four Defendants—Carrara, Richard McCormick, Michael McCormick, and Hetman—contain covenants not to compete. As a general rule, restrictive covenants must be reasonable in terms of time and scope in order to be enforceable. *Eichmann v. Nat'l Hosp. and Health Care Services, Inc.*, 308 Ill.App.3d 337, 241 Ill. Dec. 738, 719 N.E.2d 1141, 1148 (1999); *Schmersahl, Treloar & Co. v. McHugh*, 28 S.W.3d 345, 349 (Mo.Ct.App.2000). Furthermore, the essential terms of a contract must be intelligible. *Anderson v. Fel–Pro Chem. Prod.s*, 1996 U.S. Dist. LEXIS 19551, *20–*21 (N.D.Ill.1997); *see Pearson Bros. Co. v. Pearson*, 113 B.R. 469, 475 (C.D.Ill.1990); *Xu Liu v. Price Waterhouse*, 1999 WL 1012456, *4, 1999 U.S. Dist. LEXIS 16559, *13–*14 (N.D.Ill.1999).

### 1. Carrara's Contract

▮▮▮ Carrara's contract contains a restrictive covenant prohibiting him from selling, soliciting, or in any way doing business, "on a direct or indirect basis with any of the product lines, customers or accounts of the Employer within a 25 mile radius of the cities and towns in which Employer's Division or Subsidiary does business" for two years following termi-

nation. (Pl.'s Ex. 1, ¶ 1(B)(1)(b).) Immediately following this provision is the following:

(2) (Continued)
do business with any of Employer's product lines to any customers or accounts assigned to him/her by Employer during the one (1) year period prior to Employee's termination. Moreover, Employee agrees to be bound by all the other provisions of this agreement other than subparagraph (1) above.

There is no transitional language explaining of what this sentence fragment is a "continuation," nor is there any language explaining how this provision fits in with the preceding provision. On the contrary, the provision indicates that Carrara does not agree to be bound by the previous provision. Given its literal meaning, this would mean that Carrara did not agree to be bound by the covenant not to compete.

To say the least, the contract is ambiguous and unintelligible. Since there is no definite agreement on the essential terms of the restrictive covenant, it is unenforceable. *Anderson*, 1996 U.S. Dist. LEXIS 19551, *20–*21; *see Pearson Bros. Co. v. Pearson*, 113 B.R. 469, 475 (C.D.Ill.1990); *Xu Liu*, 1999 WL 1012456, **4–5, 1999 U.S. Dist. LEXIS 16559, *13–*14.

▮▮▮ Even if the contract was not ambiguous, it would still not be enforceable. The Court finds that, as applied to the industry at issue in this case, two years is an unreasonable period of time to impose in a covenant not to compete. This is because the prices, costs, and customer information governing Unisource's operations at any particular time are volatile. While some products' prices are more volatile than others, Unisource's Regional Vice President testified that changes are made within Unisource's price books about every six months, and internal pricing information is stale after twelve months. Therefore, any inside information a former em-

ployee may have upon leaving Unisource would not serve to give that employee a competitive edge for longer than six to twelve months, because the information would become stale after that time. The record indicates that a twelve month restriction would be the outside limit to protect any legitimate interest Unisource may have in this respect. Therefore, the Court finds that the restrictive covenant in Carrara's contract constitutes an invalid restraint on trade.

█ Furthermore, the restrictive covenant contained in paragraph 1(B)(1)(b) is overbroad in that it seeks to prohibit Carrara from doing business not only with the customers he worked with while employed at Unisource, but also with customers and products he never dealt with before. "Courts are hesitant to enforce prohibitions against employees servicing not only customers with whom they had direct contact, but also customers they never solicited or had contact with while employed by plaintiff." *Lawrence and Allen, Inc.*, 226 Ill.Dec. 331, 685 N.E.2d at 442. Since both covenants are unreasonable in terms of time and scope, they are invalid.

### 2. Richard McCormick's Contract

Richard McCormick's contract contains three non-compete provisions. (Pl.'s Ex. 6.) The first and third provisions prohibit him from directly or indirectly soliciting, selling to, providing services, or in any way doing business with Archer Daniels Midland (ADM) and all divisions, subsidiaries and affiliates of Tate and Lyle in any of the product lines offered by Unisource, or competitive with any product lines offered by Unisource, for six months following termination.

█ The Court finds that the six month time limitation is reasonable. The Court also finds that the narrow restriction prohibiting Richard McCormick from doing business with only two of the customers he worked with while employed at Unisource is reasonable.

█ The second non-compete provision prohibits Richard McCormick from inducing or encouraging any employee of Unisource to leave the employment of Unisource, or otherwise soliciting or hiring any such employee for six months following termination. In support of this provision, Unisource cites to *Arpac Corp. v. Murray*, 226 Ill.App.3d 65, 168 Ill.Dec. 240, 589 N.E.2d 640, 650 (1992), which upheld a restrictive covenant prohibiting a former employee from inducing the employer's other employees to quit. The court in *Arpac Corp.* reasoned that an employer has a "legitimate business interest" in maintaining a stable work force. *Id.*

█ This Court finds that *Arpac Corp.* represents a misapplication of Illinois law. As discussed later in this Order, the only two "legitimate business interests" that may give rise to a covenant not to compete in Illinois are "near permanent" relationships with customers, and confidential information or trade secrets. *Lawrence and Allen, Inc. v. Cambridge Human Res. Group*, 292 Ill.App.3d 131, 226 Ill.Dec. 331, 685 N.E.2d 434, 443 (1997). Therefore, the Court rejects the reasoning applied in *Arpac Corp.*, and finds that the covenant restricting Richard McCormick from soliciting or hiring other Unisource employees is an invalid restraint on trade. *See Schmersahl, Treloar & Co. v. McHugh*, 28 S.W.3d 345, 351 (Mo.Ct.App.2000) (finding that "an employer's interest in protecting the stability of its at-will workforce is not one of the interests which may be protected by a restrictive covenant in Missouri").[2]

---

**2.** Although Missouri law does not govern the contract in question, the Court finds the rea-

soning in *Schmersahl* to be persuasive and

■ Because there is a severability provision in paragraph 7 of Richard McCormick's contract, the Court finds it unnecessary to invalidate the entire contract. Rather, the invalid provisions may be severed, leaving the valid provisions intact. *See Abbott–Interfast Corp. v. Harkabus,* 250 Ill.App.3d 13, 189 Ill.Dec. 288, 619 N.E.2d 1337, 1343 (1993) (finding that a trial court may sever unenforceable provisions from a contract, and stating that "[t]he existence of a severability clause in a contract certainly strengthens the case for the severance of unenforceable provisions").

### 3. Michael McCormick's Contract

Michael McCormick's contract contains two covenants not to compete. (Pl.'s Ex. 4.) The first covenant prohibits him from directly or indirectly soliciting, selling to, or in any way doing business with any of the customers assigned to him or in any of the product lines sold by him within twelve months preceding his termination, for a period of two years following his termination. The second covenant prohibits him from directly or indirectly soliciting, selling to, or in any way doing business with any of Unisource's customers or accounts or in any of the product lines sold by Unisource within fifty miles of any of the offices of the division where Michael McCormick was employed, or within fifty miles of his residence, for a period of two years following his termination.

As discussed in the section of this Order addressing Carrara's contract, the Court finds that two years is an unreasonable period of time for Unisource to impose in a covenant not to compete. Therefore, the Court finds that the restrictive covenants in Michael McCormick's contract constitute invalid restraints on trade.

Furthermore, the second restrictive covenant is overbroad in that it seeks to prohibit Michael McCormick from doing business not only with the customers he worked with while employed at Unisource, but also with customers and products he has never dealt with before. Since both covenants are unreasonable in terms of time and/or scope, they are invalid.

### 4. Hetman's Contract

■ Hetman's contract contains three non-compete provisions. (Pl.'s Ex. 7.) The first provision prohibits him from directly or indirectly soliciting, selling to, providing services, or in any way doing business with any of the customers or accounts of Unisource with whom he had become associated during the twelve month period preceding his termination, in any of the product lines offered by Unisource to such customers or accounts during such twelve month period, for eighteen months following termination.

As discussed in the portion of this Order addressing Michael McCormick's contract, any period longer than twelve months is too long for Unisource to impose in a covenant not to compete. Therefore, the first covenant in Hetman's contract constitutes an invalid restraint on trade.

The second non-compete provision prohibits Hetman from inducing or encouraging any employee of Unisource to leave the employment of Unisource, or otherwise soliciting or hiring any such employee for eighteen months following termination. As discussed in the portion of this Order addressing Richard McCormick's contract, this type of covenant does not serve to protect any legitimate business interest recognized under Illinois law. Also, the eighteen month period is unreasonable.

equally applicable under Illinois law. This Court is not bound by the Illinois appellate court's decision in *Arpac Corp.,* and believes

that the Illinois Supreme Court, if and when it decides this issue, will support this Court's position.

Therefore, the second provision constitutes an invalid restraint on trade.

The third and final non-compete provision prohibits Hetman from soliciting, selling to, providing services for, or in any way doing business with any of the customers or accounts of Unisource, in any product lines competitive with any product lines offered by Unisource, within a fifty mile radius of any Unisource office or retail location in which Hetman was employed during the twelve month period preceding his termination, for eighteen months following termination.

As stated above, an eighteen month restriction is too long under the circumstances of this case. Furthermore, the covenant is overbroad in that it seeks to prohibit Hetman from doing business with customers he never met while at Unisource. Therefore, the third provision constitutes an invalid restraint on trade.

### 5. Conclusion

In sum, the restrictive covenants contained in the agreements signed by Carrara, Michael McCormick, and Hetman are invalid because they are unreasonable in terms of time, scope, and/or interest sought to be protected.[3] Only the first and third restrictive covenants contained in Richard McCormick's agreement have survived up to this point. The inquiry does not end here, however.

### D. Legitimate Business Interest of Employer

■ Covenants not to compete are only valid to the extent they protect a "legitimate business interest" of the employer. *Lawrence and Allen, Inc.*, 226

Ill.Dec. 331, 685 N.E.2d at 441; *see Armstrong v. Cape Girardeau Physicians Assoc.s*, 49 S.W.3d 821, 825 (Mo.App.2001). Only two legitimate business interests are recognized in Illinois: 1. "near-permanent" relationships with customers, and 2. trade secrets or confidential information that a former employee has acquired through his or her employment and subsequently tried to use for his or her own benefit.[4] *Id.* at 443.

■ Unisource has abandoned the argument that it has a near-permanent relationship with its customers. (Pl.'s Mem. at 6 n. 1.) Therefore, in order to enforce Richard McCormick's covenant not to compete, Unisource must prove that Richard McCormick has tried to use confidential information belonging to Unisource for the benefit of himself or Midland. *Lawrence and Allen, Inc.*, 226 Ill.Dec. 331, 685 N.E.2d at 445.

■ The parties agree that in order to be "confidential," information must not be generally known, must be valuable to competitors, and must be protected or kept secret by the business claiming that it is confidential.

The information that Unisource seeks to protect in this case includes: (1) customer information, such as the name and purchase history of specific customers, prices charged, and the profit margin from sales to those customers; (2) "off book" prices, or prices charged to customers that are lower than the prices contained in Unisource's price books; (3) information regarding key Unisource personnel, including what they do, how much they cost, and how effective they are; (4) costs and mar-

---

**3.** Because Carrara's and Michael McCormick's restrictive covenants have been found to be unenforceable, the Court finds it unnecessary to address the Defendants' argument that their agreements have been superceded by subsequent agreements with Unisource

that do not contain any non-compete provisions.

**4.** Missouri law also recognizes two narrowly defined interests: trade secrets and stock in customers. *Armstrong,* 49 S.W.3d at 825.

gins, including the "deviated" costs Unisource obtains from its vendors, the three percent "load" or "warehousing" cost, and gross trading margins; (5) information regarding customer coverage, staffing, and how Unisource conducts its business; and (6) the ten percent markup that Unisource requires in order for a sales representative to close a sale and be eligible for commission.

### 1. Customer Information

▮▮▮▮ The record in this case amply demonstrates that the identity of potential customers and suppliers is readily available in the marketplace. Information that is generally known by persons in the trade or that could easily be duplicated by reference to telephone directories or industry publications is not protectable. *Springfield Rare Coin Galleries, Inc. v. Mileham*, 250 Ill.App.3d 922, 189 Ill.Dec. 511, 620 N.E.2d 479, 485 (1993). This is especially true in industries such as that of Unisource, where customers do business with more than one distributor so that their identities are known to competitors. *Id.*

Furthermore, Illinois case law provides that a distributor has no proprietary interest in information belonging to the customer, such as the customer's own purchase history, needs and preferences. *Delta Med. Systems v. Mid-America Med. Systems, Inc.*, 331 Ill.App.3d 777, 265 Ill.Dec. 397, 772 N.E.2d 768, 783 (2002) (noting that a service provider "cannot control what a customer does with its own information"); *see Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill.App.3d 557, 175 Ill. Dec. 58, 599 N.E.2d 1072, 1084 (1992) (holding that client information is not a trade secret where it can be obtained by asking questions designed to elicit the information requested); *A.J. Dralle, Inc. v. Air Technologies, Inc.*, 255 Ill.App.3d 982, 194 Ill.Dec. 353, 627 N.E.2d 690, 697 (holding that customer information that is readily available to competitors through

normal competitive means, such as placing a cold call and asking questions, is not protectable). Therefore, a customer's purchase history is not confidential information.

The record indicates that on November 20, 2002, Baker generated a "customer list" for each Unisource sales representative working out of Morton, Illinois. According to John Montgomery, the Operations Manager at Unisource's Morton, Illinois, facility, the customer list would have contained the customer number, name, address, key contact person, and telephone number of each specific sales representative's current customers. Baker mailed Carrara's customer list to him on November 20, 2002.

After conducting an investigation, Montgomery concluded that the customer lists were generated to aid the sales representatives in sending out holiday cards. Therefore, Baker's conduct in mailing a customer list to Carrara does not appear to be suspicious or improper. In any event, based on the foregoing analysis, none of information contained in the customer list is confidential.

### 2. Price Information

▮▮▮▮ In some circumstances, "[i]tems such as customer lists, pricing information, and business techniques can be trade secrets if the employer has developed the information 'over a number of years at great expense and kept [it] under tight security.'" *Abbott–Interfast Corp.*, 189 Ill.Dec. 288, 619 N.E.2d at 1344. In this case, however, a customer who purchases products from both Unisource and Midland testified that, though not "standard procedure," from time to time his company would tell one distributor the price that a competing distributor had offered. He also stated that a sales repre-

sentative from one company would occasionally look at a competitor's price book. Furthermore, the unrebutted testimony of Carrara, Richard McCormick, and Michael McCormick was that their customers would routinely show them competitors' price books and provide them with competitive information, including prices that competitors were quoting to them.

Although the record does not indicate the exact percentage of prices shared, the Court finds that the percentage was substantial, based in part on the friendly relations between the Unisource sales people and the customer representatives. Moreover, Illinois cases hold that pricing information conveyed to a customer that the customer is at liberty to divulge is not confidential. *Carbonic Fire Extinguishers, Inc. v. Heath,* 190 Ill.App.3d 948, 138 Ill.Dec. 508, 547 N.E.2d 675, 678 (1989); *Applied Indus. Materials Corp. v. Brantjes,* 891 F.Supp. 432, 437–38 (N.D.Ill. 1994) (noting that "the Illinois appellate courts which have addressed the issue have consistently held that price information which is disclosed by a business to any of its customers, unlike a unique formula used to calculate the price information which is not disclosed to [the] business's customers, does not constitute trade secret information"). The reasoning applied in *Carbonic Fire Extinguishers* is equally applicable here:

> The pricing information here, unlike a unique formula used to calculate a price but unknown to a customer or competitors (citation omitted), was available to the various customers to which it pertained. As such, those customers were at liberty to divulge such information to a competitor of plaintiff's, or to anyone for that matter. Further, there is no evidence that someone else performing this service would not have knowledge of the normal price to be charged for this service. Plaintiff does not contend that

> its price for a job is unique or not generally known to others in the business. *Id.*

Unisource is not alleging that it had any unique pricing formula that was not disclosed to its customers. In fact, Unisource's Regional Vice President testified that the ultimate price obtained from a customer depended in large part on the sales representative. Instead, Unisource is claiming that its prices charged to customers—of which the customers were obviously aware—are confidential. However, Unisource did not require its customers to sign any confidentiality agreements or otherwise restrict the customers' freedom to disclose this information. Therefore, because competitors can obtain Unisource's price information directly from the customer, and because there is abundant evidence that sharing of information by a customer is a common event, it is not confidential.

### 3. Cost Information

■ Having found that Unisource's price information is not confidential, the Court finds that information concerning Unisource's profit margins, costs, and markups is not "valuable" enough to competitors to constitute confidential information. Although this information could conceivably assist a competitor in determining the prices Unisource charges to its customers, thereby enabling the competitor to undercut Unisource, the Court has already found that Unisource's customers are at liberty to disclose information concerning Unisource's prices. Once the price of a Unisource product is known, a competitor's focus shifts to its own costs and necessary profit margins, and the competitor then determines—based on its own internal figures—whether it can undercut Unisource in price.

Furthermore, Unisource does not use its cost information to derive any sort of pricing formula that, as a practical matter, strictly limits the prices for which its products are sold. Rather, the sales representatives are almost totally responsible for setting Unisource's prices. The parties do not dispute this fact.

Carrara testified that his average profit margin while at Unisource was between twentyfive and twenty-seven percent. Consequently, knowledge of Unisource's three percent markup for "load" or "warehousing" costs (which do not apply if the manufacturer ships a product directly to the customer), and ten percent markup for sales commissions, would not enable a competitor to pinpoint Unisource's prices. The final price Unisource charges a customer for a product ultimately has more to do with the sales representative's profit margin than the required warehouse cost or ten percent commission markup. In sum, information concerning Unisource's costs and markups is not confidential.

### 4. Personnel Information

■ Information regarding key Unisource personnel, including what they do, what they cost, and how effective they are, is not the type of information that Illinois law intends to protect in this context. As discussed under section I(C)(2) above, Unisource does not have a protectable interest in its workforce.

Furthermore, Midland's Vice President of sales and marketing, John Millin, testified in his deposition that it is generally known in the industry who the top performers are at any company. (Millin Dep. at 41.) Therefore, although information concerning specific Unisource employees' gross trading margins may not be generally available, Midland recruiters could learn from discussions with customers who the most respected sales representatives are,

and could attempt to recruit those people. (Millin Dep. at 41, 44.)

Because Unisource may not prevent its competitors from soliciting and hiring its employees, and because the reputation of sales representatives is generally known in the industry, information regarding what its employees do, how much they cost, and how effective they are is not protectable.

### 5. General Business Practices

■ General information regarding customer coverage, staffing, and how Unisource conducts its business is not protectable, because "[o]ne who works for another cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances and the over-all experience" that he acquired during the course of his employment. *Revcor, Inc. v. Fame, Inc.*, 85 Ill.App.2d 350, 228 N.E.2d 742, 746 (1967). Unisource does not allege that it has any secret methods or processes for selling products that differ from the methods and processes of its competitors. Although Unisource may send its sales representatives out to meet with customers face-to-face and develop relationships with those customers, this practice does not constitute a protected trade secret or confidential information. Rather, it is the general way that business in the industry is conducted, and such general knowledge cannot be protected by a restrictive covenant.

### 6. AS 400 Printout

On November 8, 2002, Carrara asked Baker for a printout from Unisource's AS 400 system, a database that is part of Unisource's computer network. Baker printed the requested information, which was subsequently mailed via overnight delivery to Carrara's residence on Saturday, November 9. The package mailed weighed a total of .4 pounds, which is approximate-

ly equivalent to twenty-two sheets of paper plus the mailing envelope. The printout was not returned to Unisource. Rather, Carrara alleges that he threw it away.

Although no one, including Carrara and Baker, could remember or identify what was contained in the AS 400 printout, an investigation into the matter conducted by John Montgomery revealed that the printout was probably a "Customer Transaction Analysis" (CTA). A CTA contains one specific customer's purchase history, including products ordered, prices paid, and billing dates. A CTA may also contain Unisource's costs and gross trading margins, although Carrara testified that he would frequently request that these two columns be removed.

Carrara testified that he would request a CTA four or five times a year to provide to a customer for its inventory purposes, to assist a customer in obtaining a reward under various reward programs, or for "forecasting" purposes. Therefore, it would not be abnormal or improper for Carrara to receive a twenty-two page CTA on November 9, 2002. In any event, under the foregoing analysis, none of the information contained in a CTA is confidential.

## 7. Conclusion

In sum, it is the finding of this Court that none of the information that Unisource seeks to protect is confidential. Because the record does not show that any of the Defendants acquired confidential information through his or her employment at Unisource and subsequently tried to use

that information for his or her own benefit, Unisource cannot show that its contracts with Carrara, Richard McCormick, Michael McCormick and Hetman are founded upon a "legitimate business interest." *Lawrence and Allen, Inc.*, 226 Ill.Dec. 331, 685 N.E.2d at 443. Therefore, all four restrictive covenants are unenforceable in any event.[5]

Furthermore, the provisions in Unisource's employment agreements with each of the Defendants that prohibit disclosure of "confidential information" are overbroad in that they expressly cover information generally known or available in the industry.[6] (Pl.'s Ex.s 2–3, 5, 7–10.) *See id.; AEE–EMF, Inc. v. Passmore,* 906 S.W.2d 714, 722 (Mo.Ct.App. 1995) ("Matters of general knowledge or of public knowledge in an industry cannot be appropriated by one as his secret."); *Physician Specialists in Anesthesia, P.C. v. MacNeill,* 246 Ga.App. 398, 539 S.E.2d 216, 225 (2000) ("The validity of a nondisclosure provision depends ... on two factors: (1) whether the employer is attempting to protect confidential information relating to the business, ... and (2) whether the restraint is reasonably related to the protection of the information."). Therefore, Unisource cannot rely on these provisions to prohibit the Defendants from using or disclosing the type of information at issue here.

## II. Illinois Trade Secrets Act

The parties concede that under Illinois law, there is no apparent functional

---

5. The Court notes that, if Richard McCormick's covenant not to compete was enforceable, his conduct in introducing Michael McCormick as his brother to representatives of ADM and Tate and Lyle, sitting in during Michael McCormick's meetings with those representatives, and making occasional comments during those meetings, would constitute a violation of the covenant not to compete.

6. For instance, six of the Defendants' contracts provide that "confidential information" includes the "names, addresses and buying practices of customers, customer service requirements, ... selling processes," price lists, and suppliers. (Pl.'s Ex.s 2–3, 5, 8–10.) As discussed under section I(D) of this Order, Unisource has no proprietary interest in any of this information.

difference between "confidential information" and "trade secrets." Therefore, under the foregoing analysis, Unisource has not shown that any of the Defendants has violated the Illinois Trade Secrets Act[7] by disclosing or threatening to disclose any trade secrets belonging to Unisource.

### Conclusion

For the foregoing reasons, Unisource's Motion for a Preliminary Injunction [# 3–2] is DENIED. The Temporary Restraining Order entered on January 31, 2003, is hereby dissolved.

---

7. To set forth a violation of the Illinois Trade Secrets Act, 765 ILCS 1065/2 *et seq.*, "a plaintiff must establish that the information at issue was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." *Delta Med. Systems*, 265 Ill.Dec. 397, 772 N.E.2d at 780. Under section 2(d) of the Act, a trade secret is defined as follows:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.
765 ILCS 1065/2(d).