HEALTH ALLIANCE NETWORK, INC., Qualcare, Inc. Plaintiffs

v.

CONTINENTAL CASUALTY COMPANY, CNA Insurance Company, Continental Insurance Companies, Defendants

No. 01 CIV.5858 (SCR).

United States District Court, S.D. New York.

Feb. 1, 2005.

---

Kevin J. Harrington, Harrington, Ocko & Monk, L.L.P., White Plains, NY, for Plaintiffs.

Robert M. Kaplan, Robson, Ferber, Frost, Chan & Essner, L.L.P., New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Introduction

#### a. Factual Background

The Health Alliance Network, Inc. ("HAN II") and Qualcare, Inc. ("Qualcare"; HAN II and Qualcare are collectively referred to herein as "Plaintiffs") brought this action against Continental Casualty Company ("CCC") and the Conti-

nental Insurance Company ("CIC"; CCC and CIC are collectively referred to herein as "Defendants"),[1] alleging breach of contract, unjust enrichment, misuse of confidential information and unfair competition.

Health Alliance Network, Inc. ("HAN I") was a broker of managed care health services based in White Plains, NY. Qual-Care, Inc. ("QualCare") and Focus Healthcare Management, Inc. ("Focus"), both based in New Jersey, administered networks of healthcare providers. CCC and CIC are insurance companies having their headquarters in Chicago, Illinois. They are affiliates, and are among the group of insurance companies that use the service mark "CNA." CNA, which includes two separate business units called RSKCo and Commercial Insurance, administer insurance benefit plans for injured workers.

This lawsuit arises from an October 1, 1995 agreement ("Agreement") among CNA, HAN I and Qualcare. There are three basic elements to the Agreement: HAN I and QualCare afforded CNA's insureds, and their employees, access to various networks of healthcare providers, which are known as "preferred provider organizations" or "PPOs," in the state of New Jersey; the healthcare providers charged discounted rates for their services, resulting in savings for CNA, whose insurance policies were paying the services; and CNA paid HAN I a percentage of the savings realized by CNA. The Agreement called for using a combination of providers under contract with both Qualcare and Focus (Focus and QualCare are collectively referred to herein as the "Network Providers").[2]

1. The named defendants in the case are Continental Casualty Company, CNA Insurance Company, and Continental Insurance Companies. In their moving papers, Defendants indicate that there are no legal entities named "CNA Insurance Company" or "Continental Insurance Companies." Since Plaintiffs do

not appear to dispute this, the court will refer to the defendants as they prefer.

2. Prior to entering into the Agreement, CNA used Focus providers for its workers compensation customers in New Jersey.

Specifically, the Agreement effectively guarantees [3] HAN I twenty-one percent of the difference in savings between the usual and customary or state mandated fee schedule and the fee schedule recommended by the applicable network provider agreement. HAN I, in turn, was obligated to share the payments it received from CNA with both Focus and QualCare. The Agreement does not, however, obligate Defendants or any of their affiliates or subsidiaries to use the Network Providers and, in fact, expressly provides that it is not an exclusive dealing arrangement. The evidence indicates that CNA did use providers not part of the Focus or Qual-Care networks but, of course, to the extent the Defendants used the Network Providers, CNA was required to pay HAN I the appropriate fees.

For the purposes of implementing the Agreement, Defendants retained Community Care Networks, Inc. ("CCN") as a service partner, giving it the responsibility of performing bill review services.[4] Specifically, CCN reviewed bills generated by the Network Providers in order to determine the savings generated and fees owed to HAN I. For the period December 1995 through September 1999, CCN prepared monthly reports, which it supplied to both CCC and HAN I, of all the bills that it processed. These reports contained, for each bill, the name of the patient, the name and tax identification number of the provider, the dates of service, the bill number, the provider's total charges, the savings attributable to CCN's bill review, the savings attributable to the network discounts, the amount payable to the provider, and the fees payable to HAN I. CCN also prepared cumulative reports of the

bills it processed for the period October 1999 through January 2001.

CCN's reports were the method chosen by the parties to inform HAN I of the use of its networks by CNA's insureds and, as such, to determine the amount of fees HAN I was owed. HAN I had no independent information about how much network access had occurred and did not maintain records of its own to verify the information provided by CCN each month. This division of responsibility was consistent with the terms of the Agreement. Section XII (C) of the Agreement required CNA to provide HAN I and Qualcare with the information HAN I and Qualcare required in order to confirm fees owed to them. The Agreement also required that CNA retain the service partner charged with performing data collection and bill repricing services, which in this case turned out to be CCN. Final payments to HAN I of network access fees were made by individual CNA claims examiners administering individual workers' compensation claims assigned to them. When a claims examiner received CCN's bills, it had the responsibility of drafting checks and paying HAN I on a claim by claim basis.

In 1997, the Plaintiffs began to investigate whether they were receiving all the fees they were entitled to under the Agreement. Their concern was sparked by an apparent disparity between the network access fees due HAN I as reported by CCN and the invoice payment data from CNA that accompanied its check payments. CNA informed HAN I that, in order for CNA to make payments on unpaid fees, HAN I needed to identify specif-

---

**3.** Precisely, the Agreement guarantees HAN I 26% of the difference, but it also entitles CNA to 5% of the difference as compensation for carrying out administrative duties.

**4.** The evidence indicates that CCN also operated a network of healthcare providers in New Jersey, and that CNA utilized the CCN network, in addition to the Network Providers, during the course of the Agreement.

ic network access invoices which were unpaid. HAN I then proceeded to compare invoice listings from CCN against payment data received from CNA and produced a claim-by-claim listing of invoices they believed to have been unpaid.

Plaintiffs then sent to Defendants listings of invoices from October 1, 1995 until December 31, 1997 that they believed to have been unpaid. For invoices representing unpaid claims of $1000 or more, CNA responded by producing 'summary sheets' that set forth, *inter alia*, a breakdown between the amounts it believed it had already paid, the amounts it recognized were not paid to Plaintiffs, the amounts it had paid either HAN I or CCN or Focus, and the amounts which represented claims that had already been purged from CNA's system. In at least some of the cases flagged by Plaintiffs, CNA did not specify whether certain payments had been made to HAN I or CCN or Focus. Defendants also failed to produce definitive conclusions for all invoices of unpaid claims between $100 and $1000 that were marked by Plaintiffs as unpaid. With respect to invoices that CNA acknowledged to have been unpaid, CNA paid some, but not all. Finally, with respect to invoices for claims less than $100, CNA produced no summary sheets.

The Agreement also included a "Confidentiality" clause. Specifically, CNA agreed to treat as confidential Plaintiffs' manuals, policies, procedures, provider listings, programs, agreements and reimbursement rates. During the course of their investigation into possible unpaid fees, Plaintiffs received documents from the Defendants that suggested to them that Defendants had disclosed to CCN the identities of Plaintiffs' network providers in order to assist CCN in recruiting additional providers in New Jersey for their own network of health care providers for workers compensation patients.

In 1998 and 1999, both RSKCo and Commercial Insurance decided to use a single, nationwide vendor for both network access and bill review services. HAN I and Qualcare, which could offer network access only in New Jersey, were not considered. In 1999, RSKCo decided to use CCN for both bill review and network access on a nationwide basis. Commercial Insurance decided to retain Crawford & Co for these purposes. According to Defendants, they informed QualCare, HAN I and Focus by letters dated June 14, 2000 that they were terminating the Agreement.[5]

On August 9, 2000, QualCare, HAN I, the shareholders of QualCare and another company called QualCare Alliance Networks, Inc. ("QCNA") entered into another agreement ("Exchange Agreement") that merged HAN I into QCNA. In connection with this transaction, a New York corporation named QCNA QualCare, Inc. was created in July 2000, which changed its name to Health Alliance Network, Inc. ("HAN II") in August 2000. Pursuant to the Exchange Agreement, QCNA assigned all of its rights and interests in the assets of HAN I to HAN II, without requesting the written consent of the other parties to the Agreement, even though the Agreement prohibited the assignment of rights under the Agreement without the written consent of the other parties.[6] As a result of this merger and subsequent asset transfer, it is important to note that, technically speak-

---

5.  Plaintiffs have disputed Defendants' claim to have notified them of termination at this time. There is no dispute, however, that Defendants sent letters in March 2001 indicating that they had terminated the Agreement.

6.  Moreover, the Exchange Agreement also explicitly required CNA's consent.

ing, the Plaintiff in this case is not HAN I, but rather HAN II.

### b. Procedural Posture

Defendants filed a motion for summary judgment, requesting that the court dismiss the Plaintiffs' amended complaint and award the Defendants the costs and attorneys fees incurred in defending the action. Defendants are seeking relief on several grounds: 1) the undisputed facts confirm that Defendants have paid Plaintiffs all they are owed under the contract, and thus have not breached it; 2) Plaintiffs cannot recover for unjust enrichment when there is a contract governing the relationship between the parties; 3) Plaintiffs did not provide any information that could reasonably be deemed "confidential" and, even assuming they did, there is no evidence that Defendants misused it; 4) Plaintiffs have not stated a claim for unfair competition; 5) Plaintiff HAN II was not a party to the contract and is therefore precluded from seeking relief for its breach. In their reply papers, Defendants added a request for a judgment awarding them the extra amounts of money they claim to have paid Plaintiffs under the agreement.

Plaintiffs filed a cross-motion for summary judgment, requesting that the court find Defendants liable to Plaintiffs for 1) failing to pay fees, 2) breaching confidentiality provisions of the agreement, and 3) for Plaintiffs' attorneys' fees and costs. Plaintiffs also opposed Defendants' motion for summary judgment, on several grounds: 1) the undisputed facts confirm that Defendants have not paid all fees owed to Plaintiffs pursuant to their agreement; 2) Plaintiffs may base their claim for unjust enrichment either on Defendants' alleged use of Plaintiffs' services after the contract was terminated or as an alternative form of relief in the event the court finds that HAN II is not entitled to seek relief under the contract; 3) the undisputed facts confirm that Defendants re-

ceived confidential information from Plaintiffs and willfully misused it in violation of confidentiality provisions of the agreement; 4) Plaintiffs have stated a cause of action for unfair competition; 5) Plaintiff HAN II may maintain its cause of action for breach of the agreement, despite being assigned its rights under the agreement.

### II. Analysis

### a. Applicable Legal Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*

The initial burden falls on the moving party who is required to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In resolving questions of substantive state law in this case, the court applies Illinois law, as required by Section XXIX of the Agreement.

### b. Whether Plaintiff Health Alliance Network, Inc. (HAN II) Can Maintain Its Causes of Action In This Case

Defendants argue that Plaintiff HAN II cannot maintain any causes of action under the Agreement, because CNA never consented to any assignment of HAN I's rights to HAN II, despite the Agreement's

requirement that all parties consent to any assignment.[7] Defendants' argument is unpersuasive.

It is undisputed that HAN II was created by a merger between HAN I and another company. Under Illinois law, all rights and duties of the merging corporations are automatically vested in the surviving corporation and the surviving corporation essentially stands in the same position as the merged corporation prior to the merger. *See Knoll Pharm. Co. v. Auto. Ins. Co.*, 167 F.Supp.2d 1004, 1010 n. 7 (N.D.Ill.2001). A provision requiring a contracting party's consent to transfer the rights and duties under a contract does not affect the transferability through a statutory merger. *See id.* (an insurance policy prohibiting assignment without the insurer's consent nevertheless transfers upon a merger because the reason for the no-assignment clause was to protect the insurer against an increased risk and there was no increased risk associated with the merger because the insurer would only be liable on those claims against the surviving corporation that arose out of the covered acts of the merged corporation).

In this case, HAN II was created by a merger of HAN I into QCNA. All assets and liabilities acquired by QANI were transferred to a wholly owned subsidiary of QCNA, which then immediately changed its name back to Health Alliance Network. There were no changes in the operations of the Health Alliance Network, and the merger had no effect on the rights or obligations of Defendants. Because the surviving corporation, HAN II, stands in the same position as HAN I, the rights and obligations could properly be transferred to HAN II without seeking consent from the other parties to the Agreement.[8]

Therefore, HAN II can maintain its causes of action in this case.

### c. Whether Either Party's Motion for Summary Judgment Is Appropriate With Respect to Plaintiffs' Claim of Breach of Contract for Failure to Pay Fees

Defendants argue that the record conclusively establishes that Plaintiffs were paid considerably more than what they were entitled to under the Agreement. In particular, Defendants contend that a comparison between Plaintiffs' own records of the total payments it received ("Payment Records") and the CCN reports

---

7. As a preliminary matter, it is important to note that Defendants have made no argument that Qualcare, Inc., the other named plaintiff in this case, cannot maintain any causes of action under the Agreement. Therefore, the Court must address Plaintiffs' causes of action on their merits regardless of whether HAN II can maintain causes of action in this case.

8. Defendants' argument is unpersuasive for another reason as well. Specifically, a non-assignment clause does not prohibit assignment of a right to damages for breach of the whole contract or a right arising out of due performance, but instead gives the obligor a right to damages for the breach of the terms forbidding assignment. *See Lear Siegler Diversified Holdings Corp. v. Regal–Beloit Corp.*, 1999 U.S. Dist. LEXIS 543, at *33 (N.D.Ill.

1999) citing RESTATEMENT (SECOND) OF CONTRACTS § 322(2)(a)-(b); *Lomas Mortg. U.S.A. v. W.E. O'Neil Constr. Co.*, 812 F.Supp. 841, 844 (N.D.Ill.1993) ("Where the right assigned is tantamount to an interest in receiving either payment or a damage claim, the one obligated to pay cannot complain that he or she must pay Entity A as opposed to Entity B. His or her obligation is not altered in any way. Illinois law recognizes that an assignee for collection may sue as the real party in interest although the contract itself may be unassignable."). *See also Loyola Univ. Medical Center v. Med. Care HMO*, 180 Ill.App.3d 471, 129 Ill.Dec. 360, 535 N.E.2d 1125, 1129 (1989) (in the context of a health insurance contract, a nonassignability clause does not bar assignments of the right to payment, once the loss has been incurred).

made pursuant to the Agreement ("CCN Reports") confirm that Defendants' payments actually exceeded the amounts that it owed the Plaintiffs. Specifically, the Payment Records indicate that, for the period between December 1, 1995 and September 30, 1999, HAN I received payments totaling $2,879,571.71, while the CCN Reports indicate, for that same period, Plaintiffs were owed only $2,365,400.88. For the period October 1, 1999 through January 30, 2001, the Payment Records indicate payments totaling $1,520,775 while the CCN Reports indicate an amount owing of only $1,044,598.84. As such, Defendants argue, not only are Plaintiffs owed nothing further, Defendants are owed almost a million dollars in overpayments.

In response, Plaintiffs argue that, not only are Defendants not entitled to summary judgment, the court should grant Plaintiffs' motion for summary judgment, finding Defendants liable for some unspecified amount of unpaid fees. Plaintiffs support their arguments in various ways. First, they offer evidence, including testimony by both CCN and CNA employees, acknowledging that the CCN Reports on which Defendants base their claims attributed fees rightly belonging to Plaintiffs to other providers, ultimately leading them to be paid amounts that should have been given to Plaintiffs.

Second, Plaintiffs point to evidence that Defendants actually made additional payments to Plaintiffs when, during the Reconciliation Process, Plaintiffs identified specific invoices that they claimed to have been unpaid. It is difficult to understand why Defendants would have made such payments if in fact they were convinced that they had overpaid Plaintiffs in the past.[9] Moreover, as Plaintiffs suggest, it seems at least unlikely that the Defendants would have been so negligent as to substantially overpay Plaintiffs during the course of the parties' contractual relationship.

Plaintiffs' principal argument in opposition to Defendants' motion, and in support of their own, is based on their rather exhaustive, claim-by-claim analysis of paid and unpaid invoices. As mentioned, Plaintiffs initiated a "Reconciliation" process after they began to suspect that they had been underpaid. During this process, Plaintiffs compared CCN's databases of invoices for which Plaintiffs were entitled to reimbursement against a database of CNA's payments supplied to the Plaintiffs by CNA for the purpose of this process. Plaintiffs summarized their findings in a multi-part Damages Summary Analysis ("DSA"). This analysis revealed thousands of unpaid invoices and hundreds of thousands of dollars of unpaid fees. Specifically, Plaintiffs' DSA indicates that, for the period from October 1995 through December 31, 1997 ("Phase I"), Defendants owe Plaintiffs at least $800,000 in unpaid invoices. For the period from January 1, 1998 until September 30, 1999 ("Phase II"), the DSA indicated an amount owing of at least $200,000.

Defendants reject the DSA on several grounds.[10] First, they argue that Plain-

9. Defendants' response might be that they did not learn of their overpayment until later, possibly during the litigation, and that they made payments to Plaintiffs before that simply in good faith. This may be true, but the opposite inference is also reasonable, particularly at this stage of the litigation.

10. Defendants argue that the court should not consider the DSA because Plaintiffs have not

provided a sufficient evidentiary basis for it. The court disagrees. The DSA is based on comparing invoices with CCN's databases, all of which appear to have been created during the course of the contractual relationship. See FED. RULES EVID. R. 1006. The court has not found, and Defendants have not offered, any reason why the Summary is inadmissible at this time.

tiffs failed to delete from the DSA bills for services provided by non-Network Providers. This argument is based, in part, on Defendants' specific contention that Plaintiffs are not entitled to discounts incurred as a result of discounts received from providers in the Focus network. This argument is without merit. Section VII of the Agreement clearly provides that the Network Providers include both QualCare and Focus. And even to the extent that the DSA does give 'credit' to HAN I for unpaid fees that are actually owed to non-Network Providers, it is highly unlikely that none of the unpaid invoices included in the DSA are attributable medical care provided by Qualcare or Focus providers.

Second, Defendants point out what, at least on the surface, is an internal inconsistency in Plaintiffs' argument: while on the one hand Plaintiffs challenge the accuracy of the CCN reports in order to undermine Defendants' argument, Plaintiffs' Damage Summary Analysis is itself based on the CCN reports.

Although there is force to Defendants' argument, there are several responses worth noting. First, Defendants are vulnerable to a similar criticism: on the one hand their claim to have paid HAN I more than it is owed similarly assumes the accuracy of the CCN reports even though they apparently did not rely on the reports when paying Plaintiffs during the course of the Agreement. Moreover, it seems reasonable to expect that Defendants' records are much more likely to err on the side of under-, rather than over-estimating amounts owed by Defendants to Plaintiffs. This is particularly true in light of the fact that one of the provider networks used by

Defendants and, according to Plaintiffs, given payments due HAN I was CCN itself, which, as discussed, became the Defendants' sole network provider after the Agreement was terminated.

Third, and most importantly, Defendants criticize Plaintiffs for failing to compare the payment database supplied by CNA with HAN I's own records of individual payments received from Defendants. Defendants contend that HAN I's records were far more comprehensive than Defendants' records and establish that money is owed to Defendants for the overpayments they made. In response to this latter criticism, Plaintiffs did in fact compare HAN I's own database of payments received with the reports prepared by CCN of the use of the Network Providers by CNA's insureds. The results of this analysis also suggest that CNA underpaid Plaintiffs,[11] although by a somewhat lesser amount than that suggested by the Damages Summary Analysis. Specifically, Plaintiffs found that Defendants had failed to pay Plaintiffs $460,000 in unpaid invoices in Phase I.[12]

Although this analysis is undoubtedly helpful to Plaintiffs' argument, it is subject to the same criticism that it is dependent, at least in part, on the accuracy of the CCN reports. The primary difficulty in resolving this case, indeed perhaps one of the main reasons why there is any dispute between the parties at all, is the unreliability of the CCN reports, which were supposed to provide the basis for accounting for the fees properly owed the Network Providers under the Agreement. That said, the inadequacies of the reports do not relieve the court of the responsibility of

---

**11.** Notably, the existence of this alternative analysis of alleged underpayments makes it unnecessary for the court to base its determinations solely on the Damages Summary Analysis, which Defendants have challenged as possibly inadmissible.

**12.** Plaintiffs' reply papers suggest that this analysis was not completed for other phases of the parties' contractual relationship.

resolving the cross motions for summary judgment at issue here. The unreliability of these reports, the implausibility of Defendants' arguments and the evidence offered by Plaintiffs are more than sufficient to defeat Defendants' motion for summary judgment on the issue of unpaid invoices.[13]

Having denied Defendants' motion for summary judgment, the court must turn to the Plaintiffs' cross-motion for summary judgment on the same issue. An obvious resolution of this motion is, of course, that the same disputes over amounts owing and the credibility of the CCN reports are also sufficient to defeat Plaintiffs' motion. But however obvious this resolution might be, it is troubling in light of the parties division of responsibilities under the Agreement. Put simply, it is problematic to allow Defendants to avoid Plaintiffs' claim to unpaid fees by hiding behind potential inaccuracies in the CCN reports when the Agreement gave the Defendants the responsibility for choosing the entity that would keep records of amounts owed to the Plaintiffs, and the Defendants chose CCN. The Agreement gave Plaintiffs no responsibility for keeping track of services provided by the Network Providers and the CCN Reports, with all their inadequacies, are ultimately the only basis for determining when Network Providers were used by CNA insureds and when, as a result, the Plaintiffs earned fees.

Both analyses done by Plaintiffs in this case—based on CNA's database of its own payments and its own database of individual payments received—indicate a substantial underpayment. And in producing these analyses, Plaintiffs have pointed to specific invoices for which they should have been but were not compensated, and Defendants have not provided any invoice-specific evidence that either Plaintiffs were not entitled to what they claim or that they

were in fact paid. Rather, Defendants have responded only by pointing to inaccurate reports produced by a company the Defendants chose to perform Defendants' contractual record-keeping obligations. Between the Plaintiffs and Defendants, Defendants should surely bear most of the responsibility for any uncertainties in the amounts owing caused by deficiencies in the CCN reports.

That said, the court is mindful of the standard it must apply in reviewing a motion for summary judgment, and that standard does not permit the court to substitute its judgment for that of the jury where there remain genuine disputes of fact. Material issues are in dispute in this case, and regardless of how the court suspects, at least at this stage, that these issues should ultimately be decided, Plaintiffs' cross-motion for summary judgment must also be denied.

### d. Whether Plaintiffs Can Maintain A Cause of Action for Unjust Enrichment

■ Defendants argue that Plaintiffs cannot maintain causes of action for both breach of contract and unjust enrichment simultaneously. Indeed, Illinois law precludes a Plaintiff from recovering for unjust enrichment when there is an express contract governing the relationship between the parties. *See People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (1992). Although Defendants accurately cite the applicable rule, Plaintiffs claim for unjust enrichment should not be dismissed at this time.

■ If, as Defendants claim, the Agreement was terminated in August 2000, then Plaintiffs should be able to recover any unpaid fees for Defendants' utilization of

---

**13.** For the same reasons, Defendants' claim, made in its briefing papers, for reimbursement of overpayments they claim to have made is also denied.

the network after termination. Defendants claim that there is no evidence that they utilized Plaintiffs' networks after termination, but a CCN report of workers compensation claims for the Qualcare network for the period of 10/1/1999 until 1/31/2001, attached as an exhibit to a reply declaration submitted on behalf of the Defendants, indicates some claims dated after the time Defendants claim to have terminated the Agreement. This suggests that there may have been use of Plaintiffs' networks when the Agreement was no longer in place to govern the parties' relationship.[14]

### e. Whether Plaintiffs Can Maintain Any Causes of Action Related to Defendants' Alleged Misuse of Confidential Information

Plaintiffs' third, fourth and fifth causes of action in this case involve Defendants' alleged misuse of confidential information. Specifically, the third cause of action alleges breach of the confidentiality cause of the Agreement, the fourth cause of action alleges misappropriation of trade secrets, and the fifth cause of action alleges unfair competition.

### i. Third Cause of Action for Violation of Confidentiality Clause of Agreement

Defendants have moved for summary judgment dismissing the third cause of action, and Plaintiffs have cross-moved for summary judgment finding that the Defendants breached the confidentiality clause of the Agreement.

Article XII of the Agreement required, *inter alia*, that CNA "hold Health Alliance Network's and QualCare's confidential information confidential" and defined "confi-

dential information" to include "Health Alliance Network and QualCare Company manuals, policies, procedures, provider listings, programs, agreements and reimbursement rates." Plaintiffs allege that CNA provided CCN a listing of the providers in Plaintiffs' networks as well as information on these providers' reimbursement rates in order to increase the number of providers in CCN's New Jersey network prior to terminating the Agreement and establishing its relationship with CCN.

Defendants respond with several arguments. First, they claim that there is no evidence that Defendants had any of Plaintiffs' confidential information and therefore could not have breached these provisions of the Agreement. This argument is not persuasive. First, the Agreement itself requires that HAN I provide QualCare provider information including Qualcare reimbursement rates. How CNA came across the information is irrelevant to whether it divulged the information to CCN, and there is evidence, including a '1099 listing' of providers, emails between employees at CCN and CNA, and deposition testimony, that Defendants did in fact give information on Plaintiffs' provider listings and reimbursement rates to CCN in order to develop CCN's New Jersey network.

Second, Defendants argue that the listing of the Network Providers does not constitute "confidential information" under Illinois law because contact information for the Network Providers was widely available on the internet and in other New Jersey publications. In support of their argument, Defendants cite several cases for the proposition that information cannot be deemed 'confidential' or a 'trade secret' when it is readily available and can easily

---

**14.** Both the date of the Agreement's termination and Defendants' use of Network Providers after termination are issues disputed by the parties, and Plaintiffs' ability to recover would, of course, depend on their ability to prove that their network was used after the Agreement was actually terminated.

be duplicated without involving considerable time, effort or expense. But these cases, whatever definition of 'confidential information' that they provide, are irrelevant to the third cause of action. The cases simply interpret 'confidential information' in the context of either the Illinois Trade Secrets Act or generalized covenants not to compete. Plaintiffs' third cause of action is for breach of the Agreement, which specifically defines confidential information to include provider listings and reimbursement rates, and Plaintiffs have offered adequate evidence to withstand summary judgment on whether Defendants transferred such information to CCN.

Although Plaintiffs have offered sufficient evidence to withstand Defendants' motion for summary judgment dismissing the third cause of action, the evidence they cite is not sufficient to establish liability at this stage of the litigation. Therefore, with respect to the third cause of action, both Plaintiffs' and Defendants' motion is denied.

### ii. Fourth Cause of Action for Violation of Trade Secret Law

█ The cases Defendants cite are not irrelevant, though, in the context of the Plaintiffs' fourth cause of action, for misappropriation of trade secrets. To set forth a violation of the Illinois Trade Secrets Act, 765 ILL. COMP. STAT. 1065/2 et seq. (West 2000), a plaintiff must establish that the information at issue was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *See Delta Med. Sys. v. Mid–America Med. Sys., Inc.*, 331 Ill.App.3d 777, 265 Ill.Dec. 397, 772 N.E.2d 768, 780 (2002). Defendants argue that the Plaintiffs' fourth cause of action should be dismissed because the informa-

tion at issue cannot be deemed a 'trade secret' in light of the fact that it is readily available and easily duplicated, and that there was no misappropriation of the information.

The Trade Secrets Act defines a 'trade secret' to include a "list of actual or potential customers" that is both "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILL. COMP. STAT. 1065/2(d). Illinois courts have specified that customer lists do not constitute trade secrets if they can be readily duplicated without involving considerable time, effort or expense. *See Hamer Holding Group v. Elmore*, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918–19 (1990).

█ Defendants argue that Plaintiffs are not entitled to trade secret protection because the lists of network providers and discounts are publicly available, including on QualCare's own website. Although plaintiffs concede that all of the doctors' contact information may be widely available, they insist that the contact information is not the information for which they are seeking trade secret protection. Rather, they insist, what is confidential is the doctors' willingness to participate in Plaintiffs' workers compensation network. Plaintiffs have pointed to testimony that it is more costly and difficult to recruit providers willing to treat workers compensation patients because of the lower compensation and increased paperwork associated with treating them. In light of this evidentiary record, Plaintiffs' fourth cause of action should not be dismissed.[15]

---

15. Defendants argue that the absence of any evidence that the provider listings and reimbursement rates were conveyed to Defendants

undermines this cause of action as well. The court disagrees. The contractual language indicates both parties' expectation that the

### iii. Fifth Cause of Action for Unjust Enrichment

Plaintiffs' fifth cause of action is for unfair competition. Defendants argue that this claim should also be dismissed, because the essence of the cause of action is the passing off of goods of one manufacturer for those of another, which Plaintiffs have not alleged. Defendants' argument aside, Plaintiffs' cause of action must be dismissed for another reason, not addressed by the parties.

The Illinois Trade Secrets Act explicitly states that it "is intended to displace conflicting tort, restitutionary, *unfair competition*, and other laws of this state providing remedies for misappropriation of a trade secret." 765 ILL. COMP. STAT. 1065/8(a) (emphasis added); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir.1992) (Illinois has abolished all common law theories of misuse of confidential information including unfair competition).[16] Plaintiffs' fifth cause of action alleges that Defendants unfairly and unjustifiably disclosed the confidential information to the third parties and represented that it was their own information. Because Plaintiffs are clearly seeking remedies for the misappropriation of a trade secret, their fifth cause of action must be dismissed.

### f. Cross–Motions for Attorneys Fees

Both Plaintiffs and Defendants have moved for a finding by the court that they are entitled to attorneys fees and costs.

Article XXI of the Agreement provides that "In the event that any party to this Agreement institutes any action...to enforce the terms of this Agreement..., the prevailing party shall recover all costs and attorneys fees associated with such action...." Having denied both parties' motions for summary judgment on the issue of unpaid fees, it is impossible to determine which are the prevailing parties and which, as such, are entitled to attorneys fees in this case. Therefore, Plaintiffs' and Defendants' motion for attorney fees must be denied at this time.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is DENIED IN PART and GRANTED IN PART. Plaintiffs' motion for summary judgment is DENIED. Plaintiffs' and Defendants' motions for attorneys fees are also DENIED.

It is so ordered.

---

information at issue would be conveyed to Defendants. Moreover, it is difficult to contemplate how the Agreement could be performed (or why it would be necessary) if Plaintiffs were not providing the information at issue here to CNA, so that CNA could in turn give it to its insureds.

**16.** Contractual remedies are not similarly precluded. *See* 765 ILL. COMP. STAT. 1065/8(b) (Th[e] Act does not affect...contractual remedies, whether or not based upon misappropriation of a trade secret....").